Evalenar **BRIGHT**, as administratrix of the Estate of Victor O. Bright, deceased, Plaintiff,

v.

**UNITED STATES of America**, Defendant.

Civ. A. No. 3375.

United States District Court
E. D. Illinois.

Nov. 5, 1956.

Walter C. Wellman, Chicago, Ill., Glendon C. Hodson, Centralia, Ill., for plaintiff.

C. M. Raemer, U. S. Dist. Atty., and Jack C. Morris, Asst. U. S. Dist. Atty., East St. Louis, Ill., for defendant.

JUERGENS, District Judge.

This suit was instituted by Evalenar Bright as administratrix of the estate of Victor O. Bright, deceased, against United States of America, pursuant to Section 1346(b), Title 28, United States Code, and Sections 1 and 2 of Chapter 70 entitled "Injuries," Illinois Revised Statutes, for the wrongful death of her husband. She claims damages in the sum of $25,000.

The testimony of the witnesses at the trial was to the effect that Victor O. Bright was killed on October 6, 1955, when a canopy from a T–33 jet aircraft fell out of the sky and hit him on the head. At the time of the accident Victor O. Bright was working for the Baltimore & Ohio Railroad Company as a track laborer and was killed while he and his fellow laborers were sitting on the right-of-way eating lunch at a point approximately one mile west of Ferrin, Clinton County, Illinois. At the time of his death Victor O. Bright was 44 years of age. He left Evalenar Bright, his widow; Orrin Billy Gene Bright, age 23; Dean Laverne Bright, age 18; Deloris Jones, age 18; and Irene Fay Bright, age 13, his children and only heirs at

law, him surviving. Only his widow and Irene Fay Bright, age 13, were living at home and dependent upon him for support. For about three years prior to his death Victor O. Bright was earning approximately $3,250 per year.

The jet airplane from which the canopy was released was piloted by Lt. William F. Andrews who, on October 6, 1955, and while acting within the scope of his employment, departed under written orders from Webb Air Force Base, Big Springs, Texas, to fly to Wright-Patterson Air Force Base near Mansfield Ohio, with privilege to make refueling stops. He decided to stop at Scott Air Force Base, Illinois, hereinafter called Scott, for refueling. Prior to leaving Webb Air Force Base, Lt. Andrews completed the Air Force pre-flight check and found the aircraft to be in good flying condition. He was given a weather report showing the weather to be clear from Webb Air Force Base to Scott, and he was given a visual flight rules clearance. Upon his arrival near Springfield, Missouri, which is about 180 nautical miles by air from Scott (T. Page 69), he radioed to Scott and was told the weather was changing there and that he couldn't continue under visual flight rules. When about 5 minutes to 7 minutes Southwest of Scott, he called their control, informed them of his altitude, and "requested penetration at Scott". (T. Page 35). He was cleared and told to descend to 20,000 feet and to continue in by instruments. He checked his instruments then in preparation of the let-down and continued the normal Air Force procedure for high speed penetration. He was flying into the radio compass or within a couple of points, with the radio slightly off to his right and "I then flew for approximately 7 minutes." (T. Page 35.)

The second time he called Scott he was told it would be only 5 minutes until he started his descent and in approximately 2 minutes of the "original time" his instruments gave indication that he was over the station at which time he asked if he could begin his penetration, and with permission given, he used the normal Air Force procedure for high speed penetration. (T. Page 36). He flew into darker clouds, his canopy iced over and "a lightning bolt struck right in front of the nose of the aircraft or alongside of it, the instruments began jumping, and I heard a thump in and around the aircraft." (T. Page 36.)

Lt. Andrews further testified that he changed his flight plan before he got to Springfield, Missouri, when he saw there was an overcast condition; his visibility at that time was 100 miles at 30,000 feet and he was still proceeding toward Scott. At 30,000 feet he was cruising at 400 knots an hour. He further testified that when he was from 5 minutes to 7 minutes Southwest of Scott he received information by radio from Scott that there was a storm about 70 miles Northeast of Scott; that the overcast which he observed about 100 miles before arriving at Scott was coming toward him. (T. Page 47.)

He further testified (T. Page 50) that he received no radio indication that there was any thunderstorm over Scott and that the only indication he received from Scott was that there was a thunderstorm approximately 70 miles Northeast of the field, that he flew in the overcast about 4 minutes or 5 minutes before he came into the cloud which turned out to be a thunderstorm. He further testified that he lost complete control of his aircraft and that "the only thing to do was get out of the aircraft." Major William F. Boutwell and Captain Thomas Dale Alexander, both stationed at Scott, qualified as experts in the flying of airplanes including the T–33, and both, in answer to a hypothetical question, stated that under the conditions related, Lt. Andrews should have continued his flight and that he only conducted himself as any reasonable pilot would. Major Boutwell and Captain Alexander are correct when they say that "any reasonable pilot would have bailed out." But here Lt. Andrews had not prepared himself for any eventuality when he entered the overcast, he was taken by complete surprise and he lost

control of his airplane. Nowhere do they state that he acted as a "reasonable pilot" when he went into the overcast unprepared.

Major Boutwell further testified that pilots have the right to exercise their own judgment when they see a cloud ahead of them. Captain Alexander testified that the pilot, after he sees a storm cloud, has a discretion as to whether he wishes to go through the storm cloud or around it and that in his opinion Lt. Andrews lost control of his aircraft which could be caused by the fact that he entered the thunderstorm while in an overcast condition and it caught him unprepared and the immediate severity of the turbulence could cause the aircraft to obtain unusual positions, that if, when entering a thunderstorm cloud a pilot prepares himself for any eventuality, the possibility of him losing control of his airplane is minimized. (T. PP. 80, 81, 82.)

 When Lt. Andrews left Webb Air Force Base, he was proceeding from a Southwesterly direction to a Northeasterly direction to Scott Air Force Base, Illinois. The position of his airplane at the time that the canopy was released which struck the plaintiff's intestate was approximately one mile west of Ferrin, Clinton County, Illinois. The Court will take judicial knowledge of the fact that Ferrin, Clinton County, Illinois, is approximately 35 to 40 miles in a Northeasterly direction from Scott. There has been no explanation in this record why Lt. Andrews should be approaching Scott from a Northeasterly direction when the testimony shows that he was proceeding from Webb Air Force Base, Big Springs, Texas, from a Southwesterly direction to Scott in a Northeasterly direction. There has been no explanation in this record by Scott, if it was able to advise Lt. Andrews of a thunderstorm approximately 70 miles Northeast, they could not, with the modern, advanced methods of making such determination, have notified him of a thunderstorm approximately 35 miles Northeast of Scott which was the position of the airplane at the

time of the incident in question. The testimony further shows that it is not impossible to control an airplane in a violent thunderstorm if the pilot prepares himself for such an eventuality. The Court is not finding fault with Lt. Andrews for bailing out after he lost control of his airplane. It was the only thing that any reasonable normal pilot would do, and this Court is not criticizing or censuring Lt. Andrews for his action.

There is confusion in the testimony. Lt. Andrews repeatedly refers to his approach to Scott from the Southwest (which would be his line of flight from Webb Air Force Base), that his instruments gave indications (T. Page 36) that he was over the station (Scott) and received permission to land. After this he flew into darker clouds, his speed was reduced and we find the incident, out of which this law suit arose, happening some 35 Miles to 40 miles in a Northeasterly direction from Scott. And during all this time Lt. Andrews received no intelligence from Scott of any thunderstorm in the area, except the one some 70 miles in a Northeasterly direction from Scott.

 The rule in Illinois is that negligence is a positive wrong and the burden of proving it is on the party averring it, although negligence may be either by commission or omission. It may be proven by direct evidence or by giving in evidence such facts and circumstances as will afford a reasonable inference to that effect. Wallis v. Villanti, 2 Ill.App.2d 446, 120 N.E.2d 76.

From hearing the testimony in open court, from reading the transcript of the testimony furnished to the Court and the briefs submitted by the respective parties, and the Court being fully advised in the premises, finds that:

 1. Scott Air Force Base, Illinois, a United States Military installation, was negligent in not reporting to Lt. Andrews the thunderstorm which Lt. Andrews ran into unprepared which caused him to lose control of the plane

which resulted in the death of the plaintiff's intestate.

2. Lt. Andrews was negligent in not, after he had entered the overcast, preparing himself for any eventuality which would prevent him from losing control of his aircraft which caused him to release the canopy which struck and killed plaintiff's intestate.

3. Lt. Andrews was negligent in not going around the storm clouds when it was within his discretion to do so.

4. The negligence above set forth was the proximate cause of the death of the plaintiff's intestate.

5. The doctrine of res ipsa loquitur does not apply to this case.

6. The doctrine of "Act of God" does not apply because of the intervening force of man.

7. The deceased and the plaintiff and the next of kin were in the exercise of due care and caution for their own safety.

8. The deceased prior to his death was earning $1.571 per hour for a regular work week of 40 hours, that his expectancy of life was 26.01 years and that he left him surviving his widow, Evalenar Bright, and his daughter, Irene Fay Bright, age 13, as his child and only heir-at-law, dependent upon him for support.

9. The plaintiff as administratrix of the estate of Victor O. Bright, deceased, should have and recover of and from the United States of America, the defendant, the sum of $25,000 as and for her damages herein.

10. A fair and reasonable fee for Mr. Walter C. Wellman and Mr. Glendon C. Hodson, attorneys for plaintiff, is the sum of 20% of the amount recovered; namely, $5,000.

11. The remainder; namely, $20,000 should be distributed as follows: $16,000 to the widow, Evalenar Bright, and $4,000 to Irene Fay Bright, minor child, dependent upon the deceased for her support.

The above opinion shall be considered as the findings of facts and conclusions of law in this case as provided for by Rule 52 of the Rules of Civil Procedure, Title 28 United States Code.

An order shall be prepared in accordance with the above findings.