BRANIFF AIRWAYS, INC., Plaintiff,

v.

UNITED STATES of America, Defendant.

Thomas Donald GEORGE, Charles F. Fink, John Cooper Winthrop, Marcia E. Leake, a widow, Ernestine King, a widow, Ethel Jean Showman, a widow, and Donald Showman and Sylvia Jean Showman, minors, by and through their guardian and next friend, Ethel Jean Showman; Mrs. George W. Hogan, a widow, and Mrs. George W. Hogan, as the guardian and next friend of any and all issue resulting from her marriage to George W. Hogan, and Deanna Jean Hogan and Patricia Sue Hogan and John Warren Hogan, the minor children of George W. Hogan, by and through Lois E. Hogan, as their guardian and mother, individually and for the use and benefit of The Travelers Insurance Company, a corporation, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 9825–M, 9832–M to 9839–M.

United States District Court
S. D. Florida,
Miami Division.

Sept. 21, 1961.

Dow & Stonebridge, Wilbur E. Dow, Jr., New York City, Fowler, White, Gillen, Humkey & Trenam (Walter Humkey) Miami, Fla., for Braniff Airways, Inc.

Max L. Kane, U. S. Dept. of Justice, William A. Crawford, Washington, D. C., Edward F. Boardman, U. S. Atty., Miami, Fla., for the Government.

Dean, Adams, Fischer & Gautier, Goble D. Dean, Miami, Fla., for individual plaintiffs.

CHOATE, District Judge.

A.

JURISDICTIONAL FACTS

1. These actions were brought against the United States of America, seeking money damages for injury, loss of property, personal injury, and death, which the plaintiffs allege were caused by the negligence and wrongful acts or omissions of employees of the defendant while acting within the scope of their office and employment, under circumstances where the United States of America, if a private person, would be liable to the claimant in accordance with the law of the place where the acts or omissions occurred. The actions were brought pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346 (b), 2671 et seq.

2. The actions arise out of the crash of a DC–7C airliner on March 25, 1958, which the plaintiffs allege would not have crashed but for the negligent and wrongful acts of the air traffic control personnel at Miami International Airport.

3. The air traffic control personnel in question were at all times germane to this action in the employ of the Civil Aeronautics Administration or the Civil Aeronautics Board, referred to below as the C.A.A. and the C.A.B. The C.A.A. and the C.A.B. were at all times germane to this action duly constituted agencies of the United States of America.

## B.

### IDENTITY OF THE NAMED PLAINTIFFS

4. Braniff Airways, Inc., is now and was at all times germane to this action a common carrier for hire of passengers, mail, and other personal property in scheduled services. It is now and was at all times germane to this action a corporation duly organized and existing under the laws of the state of Oklahoma, with its principal base of operations at Dallas, Texas. It does now and did at all times germane to this action operate under a Certificate of Public Convenience and Necessity and Scheduled Air Carrier Certificate issued by the C.A.B. pursuant to the Civil Aeronautics Act of 1938, as amended, 49 U.S.C.A. § 401 et seq. (Stipulated Fact Numbers ["Stip.No." below] 1, 2)

5. Plaintiffs Thomas Donald George, John C. Winthrop, and Charles F. Fink were the pilot (Captain), 1st Officer (Co-pilot), and 2nd Officer (Flight Engineer), respectively, of the DC-7C aircraft which crashed.

6. Plaintiffs Leake, King, Showman, and Hogan are the wives and children of Braniff Captains Leake, King, Showman and Hogan, respectively.

7. The Travelers Insurance Company is and was at all times germane to this action a corporation. Its interest extends by subrogation to the amount of funds it has paid out to the individual plaintiffs named in paragraphs 5 and 6 above.

## C.

### TRIAL TO THE COURT

8. Trial was to the Court as required by 28 U.S.C.A. § 2402.

## D.

### BRIEF DESCRIPTION OF THE AIRCRAFT AND ITS OWNERSHIP

9. On March 24, 1958 and March 25, 1958, and at all other times germane to this action, plaintiff Braniff Airways, Inc., owned and was operating aircraft N5904. Aircraft N5904 was a Douglas DC-7C, designed for long-range passenger and cargo transportation. (Stip. No. 3)

10. The aircraft was powered by four Wright turbo compound eighteen cylinder radial engines, identified by the manufacturer's model number 988TC 18 EA1. (Sweeney, 430)

## E.

### PRELIMINARY PROCEDURE BEFORE THE TAKE-OFF OF BRANIFF FLIGHT 971

11. In addition to plaintiffs George, Winthrop, and Fink, the flight crew of Braniff Flight 971 included purser Alberto Zapetero and hostess Madeline Campion.

12. The aircraft was loaded with air freight, United States mail, baggage, company material, four deadheading Braniff captains (whose wives and children are plaintiffs in these actions) and fifteen other passengers. The gross weight of the aircraft was 114,938 pounds. The allowable gross weight for DC-7 aircraft was 143,000 pounds.

13. All pre-flight routine was completed by the flight crew and was normal.

14. Overhaul records of the No. 3 engine indicate that the engine had been overhauled in accordance with specifications issued by the manufacturer and in compliance with the engineering releases issued by Braniff Airways, Inc. (Def.Adm. 30) The last three maintenance checks and the last service check of the aircraft had been signed off by the mechanics and inspectors. (Def.Partial Adm. 31)

15. The aircraft received a clearance providing for take-off from runway 27–R

of Miami International Airport, a 180° right turn after take-off, and a climb on an eastbound heading of 090° to 2,500 feet before proceeding on course. It had filed an IFR (Instrument Flight Rules) flight plan.

16. The fire-warning apparatus had been checked by the flight crew prior to take-off on the ramp and on engine run-up, and these checks indicated that it was functioning normally.

17. Runway 27–R was 9,400 feet long on March 25, 1958, but the first 1,200 feet were not visible by personnel in the control tower and were not used for the take-off roll.

## F.

## GENERAL DESCRIPTION OF THE ACCIDENT

18. At 0004, March 25, 1958, aircraft N5904 became airborne from runway 27–R of Miami International Airport as Braniff Flight 971, bound for Rio de Janeiro, Brazil, with a scheduled stop at Panama City, Panama. (Stip. No. 7)

19. On take-off there were no fires in or about engine # 3 other than the exhaust fires normally accompanying the operation of an internal combustion airplane engine of the type installed in the aircraft N5904.

20. Just prior to the take-off of Braniff Flight 971, a C–46 had taken off from runway 27–R on a clearance which would make it cross the path of Braniff 971, at different altitudes.

21. James M. Noe was on duty in the Tower on March 25, 1958, assigned to the local control position and he cleared Braniff 971 down runway 27–R to take-off position and also relayed to it the instruction from departure control regarding the plane's clearance.

22. Noe observed Braniff 971 take off until it became airborne and noted nothing unusual. He then began a scanning process over the remaining area of the sky for any possible conflicting traffic.

23. Robert D. Montieth was on duty in the Tower on March 25, 1958, assigned to the approach and departure control positions. He saw Braniff 971 take off and was aware of its leaving the airfield and noted nothing unusual as to its departure.

24. The first observation of a glow in the sky by personnel in the Tower was made by William H. Maxwell, who on March 25, 1958, was assisting Mr. Montieth at the departure control position. Maxwell shouted something about a fire.

25. At the time Mr. Maxwell observed the glow in the sky, he was not aware of what plane was involved although he was reasonably sure it was a plane. The plane at the time was in a slight right turn.

26. The glow Mr. Maxwell observed remained in his vision for approximately 30 seconds before it crashed to the ground.

27. Mr. Montieth heard Mr. Maxwell's exclamation about a fire and looked up to see an orange ball of flame. The ball of flame appeared to him to be in a turn to the right at the time.

28. Montieth did not recall the time he had the fire in sight but estimated it to be one minute based upon calculations made later.

29. Mr. Noe, as he was returning from the scanning of the remaining area, saw the orange glow, approximately 2 to 3 miles from the Tower, moving to the right on a northerly heading, almost simultaneously with the exclamation of "fire."

30. Mr. Noe had the glow in view for approximately 20 seconds prior to the crash.

31. Kenneth I. Schwinger had been on duty as watch supervisor in the Tower until midnight, March 24, 1958. He was off duty at the time of the accident.

32. Maxwell's call of fire, or words to that effect, caused Mr. Schwinger to return to the Tower. He saw a bright orange glow to the west which appeared to be moving away and to the right.

33. Mr. Schwinger had the glow in view for approximately 20 seconds prior to the crash.

34. Mr. Noe heard a call "Braniff 971" a few seconds before the crash, and acknowledged the said call.

35. Mr. Maxwell heard the call "Braniff 971" approximately three to five seconds before the plane crashed.

36. Braniff 971 was making a speed of approximately 165 knots at the time 1st Officer Winthrop heard a thud and saw the fire enveloping # 3 engine.

37. At the time 1st Officer Winthrop exclaimed that # 3 had a fire, the landing gear and air flaps on the plane had been retracted, the "fasten seat belt" and "no smoking" signs had been turned off, the climb check list had been gone through, the captain had called for two reductions in power, from take-off to METO and then to climb, and the airplane was still going straight out.

38. Simultaneously with the thud and fire in # 3 engine, the firewarning system was activated, including the sounding of an alarm bell and the lighting of the # 3 firewarning signal, and the manifold pressure or BMEP gauge reflected the failure of the engine.

39. Captain George gave orders to feather the # 3 engine and fire emergency procedures were started. The fire wall shut-off and the freon discharger were pulled.

40. A few seconds before the crash of Flight 971, Captain George told 1st Officer Winthrop to call the Tower to tell them the plane was returning.

41. The # 11 cylinder of the # 3 engine had failed in flight approximately 1⅝ths inches above the mounting flange and had separated from the engine.

42. The # 11 cylinder barrel failure was a development from fatigue in the metal of the barrel and occurred as a sudden rupture rather than a gradual opening.

43. The failure of the # 11 cylinder and its separation from the # 3 engine immediately upon such failure caused a rupture in the fuel line to that cylinder permitting crankcase lubricating oil largely in vaporized form to escape into the engine nacelle.

44. Immediately thereafter, a pressure oil line lying adjacent to the # 11 cylinder ruptured permitting large additional quantities of lubricating oil to escape into the engine nacelle.

45. The large quantities of these combustibles released into the engine nacelle were immediately ignited within the nacelle upon contact with the hot exhaust manifolds and power recovery turbine, resulting in the eruption of a large blossoming fire in and around the # 3 engine.

46. The ignition was complete within a maximum of 3 to 5 seconds after the cylinder failure.

47. The failure of the cylinder was accompanied by a so-called thud or whoosh, which was heard by the crew of the plane; by a lighting up of the sky, which was seen by the crew; and by the activation of the fire emergency warning signals within the nacelle, all of which gave immediate and simultaneous warning to the crew of the existence and site of the fire.

48. The flight crew became aware of the fire in and about the # 3 engine while the plane was still climbing straight out.

49. The Tower personnel on duty on the morning of March 25, 1958, could not and did not see any indication of fire in or about the # 3 engine of Flight 971 at lift-off or as it left the runway, or at any time prior to the time the crew became aware of the fire and its site.

50. When the ball of fire associated with a plane was first observed by personnel in the Tower, the plane had already begun and was in a right turn or on a northerly heading.

51. The stall speed of a DC–7C plane under the atmospheric conditions obtaining at the time of the accident is 107–108 knots.

52. Braniff 971 was traveling at 165 knots at the time the fire erupted.

53. If the fire were of such intensity as to affect the air flow over an area with a radius of 150 feet around the airfoil of the wing of a 4-engine DC–7C type plane, when such plane is moving at a speed of 165 knots (190 mph), it would

take the plane only ⅝ths of a second to move out of the disturbed area into an undisturbed area where the air flow over the wings would be immediately restored.

54.   The abrupt and disturbing condition occasioned even by an explosion of that magnitude would not affect the controllability of the airplane because of the brief interval involved.

55.   The captain, immediately upon the cylinder failure and the accompanying blossoming fire, ordered the # 3 engine feathered.   At the time of the fire, each engine was at climb power setting developing 2080 H.P.   At take-off power each engine could develop 3400 H.P.   At the time of the fire and crash, there was approximately an additional 4000 H.P. available on the remaining three engines, no part of which was called upon or utilized by the captain of Flight 971 although recognized practice when an engine has stalled includes the application of more power to prevent loss of altitude.

56.   The aircraft, loaded as it was, and under the existing atmospheric conditions, was capable of climbing with one engine feathered at a rate of about 470 feet per minute, and was designed to, and was capable of flying with little trouble on three engines, especially where the feathered engine was the # 3 or right inboard one.   The loss of the power from the # 3 engine would, unless corrective action were taken by the pilot, result in a yaw to the right with the right wing and nose dropping.

57.   The first person in the Tower to see the fire and raise a cry had the fire in sight for a maximum of 30 seconds prior to the crash.

58.   The flight crew was already aware of the fire and had begun emergency operations at the time it first became visible to any of the control tower personnel, and any attempts by the Tower to communicate with the plane thereafter would have been futile and superfluous and the crew would have ignored any calls from Tower personnel.

59.   The plane crashed at approximately 0006, approximately 3.1 miles from the end of runway 27–R and at the time it struck the ground was on a heading of 023° magnetic and was traveling at 178 knots.

60.   The Tower personnel were in no position to, and could not have taken any action with respect to, the operation of the plane which could have or would have averted the accident.

61.   There was no act or omission to act on the part of the defendant or its employees which could be deemed to be negligent under the circumstances of these cases.

## CONCLUSIONS OF LAW

1.   This court has jurisdiction over the parties and the subject matter of this action.

2.   The Federal Aviation Agency is an agency of the United States Government within the meaning of the Federal Tort Claims Act.

3.   The United States of America is not liable under the Federal Tort Claims Act unless a negligent or wrongful act is performed by an employee acting within the scope of his employment, 28 U.S.C. § 1346(b).

4.   There was no negligence or wrongful act or omission on the part of the Civil Aeronautics Administration or any other agency or any employee thereof in not promulgating rules and regulations establishing specifications and set emergency warning routines to be followed by Tower personnel in case of fire aboard airborne craft.   In any case, the activity comes within the exception found in Section 2680(a) of Title 28 U.S.C., and this court would have no jurisdiction over claims encompassed by such exception.

5.   The defendant was not negligent as regards the actions of its Tower employees on the morning of March 25, 1958, and such Tower employees discharged their duties with diligence under the circumstances that existed at the time and place of this accident.

6.   The defendant breached no duty of care owed to the plaintiffs.

7. There was no causal connection between any alleged act or omission to act on the part of defendant and the resultant accident and injuries.

8. Plaintiffs are not entitled to the relief sought; and defendant is entitled to judgment dismissing the complaints with costs.