Joan C. KULLBERG, now Joan C. Heller, Executrix of the Estate of Richard Robert Kullberg, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 63–008.

United States District Court
W. D. Pennsylvania.

March 3, 1964.

Richard S. Crone, of Crone & Cohen, Pittsburgh, Pa., for plaintiff.

Philip Silverman, Atty., Dept. of Justice, William Kraham, Atty., Federal Aviation Agency, Washington, D. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER OF COURT

MARSH, District Judge.

This action is grounded upon the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., and arises out of the death of Richard Robert Kullberg, who perished together with Duane A. Rowe and William Lee Smith on January 8, 1961, when a single-engine Cessna Model 180 aircraft,[1] of which the three were the sole occupants, crashed during a radar-assisted approach to Greater Pittsburgh Airport in this District.

Plaintiff, Kullberg's widow, seeks to recover damages against the United States on behalf of herself and her children, and, on behalf of her late husband's estate, in accordance, respectively, with the Wrongful Death [2] and Survival [3] Acts of Pennsylvania.

## CONTENTIONS OF PARTIES

The parties agree that the Cessna sustained in-flight breakup prior to crashing. Defendant contends that the breakup was due to the application to the aircraft of heavy aerodynamic forces most probably encountered while the aircraft descended out of control in a high-speed spiral; that the pilot lost control when he became disoriented upon entering a solid overcast and losing his visual references therein. Plaintiff vigorously contends that the Cessna's breakup resulted from paralysis or malfunctioning of flight controls caused by an encounter with icing conditions, but that, in any event, negligence on the part of the defendant and/or its employees led to the in-flight breakup and was therefore the proximate cause of the crash.

Plaintiff alleged multifarious acts of negligence on the part of Federal Aviation Agency (F.A.A.) employees of the defendant, to-wit: that Approach Control personnel at Greater Pittsburgh Airport (GPA) breached a duty owed to her decedent "in failing to warn the pilot of the hazardous weather conditions, in failing to direct the pilot to use his 2½ hours of available fuel in seeking a safer airport, and in directing the pilot to descend to and hold at an altitude in the clouds where the turbulance and icing conditions were the worst";[4] that personnel at the Pittsburgh Flight Service Station breached a duty owed to her decedent by failing to give "weather information" to the pilot of the Cessna and to the approach controller; that the approach controller and sundry other government personnel failed to coordinate in ascertaining and advising one another of pertinent weather information by which to guide the Cessna; and that the approach controller "failed to use his best judgment in providing radar assistance to a VFR aircraft requesting same."[5] Plaintiff also alleged that the defendant itself was negligent in failing to provide a proper weather advisory system for light aircraft and fail-

---

1. The aircraft, Register No. N5138E, was owned by the Kullberg Drilling Company, Inc.

2. 12 Purdon's Pa.Stat.Ann. § 1601 et seq.

3. 20 Purdon's Pa.Stat.Ann. § 320.601 et seq.

4. Pretrial Stipulation, p. 8.

5. Amendment to Pretrial Stipulation, p. 1.

ing to have detailed rules guiding controllers rendering radar assistance to VFR aircraft requesting the same.

Defendant denies that the alleged duties were owed under the circumstances of this case, and even if they were owed, that any of such duties were breached. Defendant denies any causal relationship between acts or omissions of its employees and the crash of the Cessna, and contends that even if some negligent act or omission on the part of its employees was a proximate cause of Kullberg's death, plaintiff should be barred from recovery because of contributory negligence on the part of her decedent.

After trial to the court without a jury, 28 U.S.C. § 2402, we make the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Plaintiff, widow of Richard Robert Kullberg, is the duly qualified Executrix of his Last Will and Testament.

2. As said Executrix, plaintiff seeks to recover damages in this action in behalf of herself and her minor children, and in behalf of the Estate of Richard Robert Kullberg, under 12 Purdon's Pa. Stat.Ann. §§ 1601 et seq. and 20 Purdon's Pa.Stat.Ann. §§ 320.601 et seq., which statutes are respectively the Wrongful Death and Survival Acts of the Commonwealth of Pennsylvania.

3. This action is brought pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq., for damages allegedly caused by negligent and wrongful acts or omissions to act of employees of the defendant while acting within the scope of their office and employment, under circumstances wherein the United States of America, if a private person, would be liable to the claimant in accordance with the law of the place (Pennsylvania) where the acts or omissions occurred.

4. All of the allegedly tortious acts or omissions to act on the part of the defendant's employees caused harm to Richard Robert Kullberg, if at all, within the borders of this, the Western District of Pennsylvania.

5. On January 7, 1961, plaintiff's decedent resided together with plaintiff and their children at 2711 Horton Road, Jackson, Michigan. Decedent owned 98% of the stock of Kullberg Drilling Company, Inc., a Montana corporation with activities then centered almost entirely in the State of Michigan. He was a director, the president, and the sole active managing officer of the corporation. His residence served as the offices of the corporation. The corporation had been formed solely to serve his business purposes and he and the corporation were to all intents and purposes the same entity.

6. Although N5138E was owned by Kullberg Drilling Company, Kullberg's control of that corporation enabled him to exercise complete dominion over the aircraft. The Cessna was solely and exclusively at his disposal and so utilized by him, and at all times he acted and was treated as the pilot in command and de facto owner thereof.

7. Kullberg possessed a private pilot's license, but was not rated for instrument flying in IFR (Instrument Flight Rules) weather conditions.

8. Kullberg took off alone in N5138E from Jackson, Michigan, at approximately 1:00 P.M., C.S.T., on January 7, 1961, bound for Pittsburgh, Pennsylvania, upon Kullberg Drilling Company business. By prearrangement, he stopped over in Chicago, Illinois, for a reunion with William Lee Smith. Kullberg was in Chicago for approximately ten (10) hours during this stopover.

9. The Cessna, with Kullberg, Smith, and one Duane A. Rowe as occupants, took off from Midway Airport, Chicago, at approximately 12:16 A.M., C. S. T., on January 8, 1961, headed for Pittsburgh.

10. Kullberg was the pilot of N5138E during the takeoff from Midway Airport,[6] and at all times relevant hereto.

---

6. Pretrial Stipulation, p. 4.

11. Plaintiff has produced no evidence to indicate that Kullberg turned over control of the aircraft to either Smith or Rowe at any time during the ensuing flight.

12. Kullberg, as pilot upon take-off and as the pilot responsible to Kullberg Drilling Company for the operation and safety of N5138E, was the pilot in command [7] of N5138E during the entire flight from Chicago.

13. Attributing a presumption of due care to Kullberg,[8] and considering the testimony of John Blasic, United States Weather Bureau pilot briefer at Midway during the evening of January 7, 1961, we find that such pilot received from Blasic, prior to take-off, a weather forecast for Pittsburgh of overcast, light snow flurries, 15 miles visibility, tops of clouds at 5000–6000 feet, possibility of light to moderate icing, and en route ceiling of 2,000 feet minimum.

14. The flight was heard from en route at approximately 3:11 A.M., E.S.T., by the F.A.A. Flight Service Station at Akron, Ohio, to which it identified itself as "N5138E", reported its altitude as 11,000 feet "on top", and directed an inquiry as to the weather at Pittsburgh. It was advised that current Pittsburgh weather was ceiling 2,000 feet overcast, visibility more than 15 miles, very light snow showers, temperature 34°, dewpoint 24°, wind W.N.W. 18. In accordance with F.A.A. regulations requiring dissemination of flash advisory forecasts to en route aircraft, N5138E was then given a flash advisory forecast for the northern third of Ohio, western New York, and western Pennsylvania of moderate to locally severe turbulence below 10,000 feet with moderate to occasionally heavy icing. The forecast covered the time required for the flight to reach Pittsburgh. At this point, the pilot of N5138E asked the Akron Station if the Greater Pittsburgh Airport (GPA) radar approach facilities were functioning. Akron contacted Approach Control at GPA, was advised that said facility's radar was indeed functioning, and so informed N5138E.

15. Approximately 30 minutes later, at 3:44 A.M., E.S.T., N5138E contacted the F.A.A. Pittsburgh Flight Service Station (PFSS) at Allegheny County Airport, Dravosburg, Pennsylvania. It reported its position as 12,500 feet over the Pittsburgh "Omni" or V.O.R. (Very High Frequency Omni (Directional) Range Radio Transmitting Station), which is just south of the Allegheny County Airport, and approximately 17 miles southeast of GPA. The flight advised that it desired radar landing assistance at GPA and requested the radio frequency of GPA's Approach Control. PFSS immediately informed Approach Control of the request and Approach Control suggested a radio frequency which N5138E acknowledged to be acceptable and subsequently utilized to contact Approach Control. During their brief contact, PFSS and Approach Control did not discuss or exchange weather data. There is no credible evidence that N5138E requested or was given any

---

7. 14 C.F.R. § 43.70 provided:
"§ 43.70 Definitions.
"As used in this part terms shall be defined as follows:
"* * *
"Pilot. A pilot is a person holding a valid pilot certificate issued by the Administrator.
"Pilot in command. Pilot in command shall mean the pilot responsible for the operation and safety of the aircraft during the time defined as flight time."

8. 14 C.F.R. § 60.11 provided:
"§ 60.11 Preflight action.
"Before beginning a flight, the pilot in command of the aircraft shall familiarize himself with all available information appropriate to the intended operation. Preflight action for flights away from the vicinity of an airport, and for all IFR flights, *shall include a careful study of available current weather reports and forecasts, taking into consideration fuel requirements, an alternate course of action if the flight cannot be completed as planned,* and also any known traffic delays of which he has been advised by air traffic control." (Emphasis supplied.)
Cf. El Paso Natural Gas Co. v. United States, Docket 5610 (W.D.Wash., December 31, 1963).

weather information by PFSS during their brief contact, or that PFSS then or at any other relevant time informed Approach Control of, or was requested by Approach Control to furnish, any information which it possessed relative to icing and turbulence and the height of the overcast. However, the Cessna, intending to land at GPA, was not at that late stage of its flight within the category of "en route" aircraft to which flight service stations were obligated by regulations to furnish the latest flash advisory forecasts. Furthermore, it is clear that the only weather information ("current" and "forecast") available to PFSS at the time of the contact was identical to that already furnished the Cessna by the Akron station.

16. Government Exhibit G, a certified typewritten transcript of the tape recording of the complete radio conversation between Approach Control and N5138E, accurately states that conservation.

17. The times stated in such transcript represent Greenwich Mean Time. Eastern Standard Time is determined by subtracting five hours from Greenwich Mean Time.

18. The Cessna initially contacted Approach Control at 3:47:03 A.M., E.S. T., reporting its position at 12,500 feet over the "Omni". At this time, it was actually 9 miles northeast of the Omni and proceeding in a northeasterly direction. It had been "tracked" by means of Approach Control's surveillance radar scope from the time of its original appearance thereon (aircraft within a 30-mile radius of the appropriate radar screen at GPA would be seen upon the scope).

19. At 3:47:15 A.M., Approach Control inquired as to the type of assistance desired by N5138E and was eventually informed (3:47:33) that the flight desired radar assistance in let down. One type of radar assistance is "vectoring" (providing compass headings) for an IFR approach to a landing.

20. Approach Control then inquired as to the amount of fuel aboard and was advised (3:47:42) that the Cessna had fuel available for 2½ hours of flying time. The inquiry was made for the purpose of ascertaining whether the Cessna required any priority treatment, and the response indicated to Approach Control that it did not.

21. The conversation between N5138E and Approach Control at 3:48:44 to 3:-48:49 indicates that the flight was then VFR at 12,600 feet, on top of the overcast.

22. At 3:49:27, N5138E was cleared to descend to 6,000 feet and requested to advise leaving altitudes. At 3:49:33 Cessna started its let down from 12,600 feet. At 3:51:28, approximately two minutes later, it reported its altitude as 11,000 feet, established on a heading of 360°.

23. A Capital Airliner had been transferred to the jurisdiction of Approach Control by the GPA traffic control center at an altitude of 5,000 feet shortly before N5138E's initial contact with Approach Control. The airliner was then in the overcast, and maintained its altitude while being observed and vectored by Approach Control. At 3:50:47, it reported ground contact at 3,500 feet MSL (2332 feet above GPA), and at 3:51:55 was turned over to the control tower frequency for its final approach.

24. There was a solid overcast between 2,000 and 8,500 feet over GPA and the surrounding area.

25. At no time did the Capital flight report any icing, turbulence or other difficulty to Approach Control.

26. At 3:51:38, 10 seconds after the Cessna reported his altitude at 11,000 feet, the Cessna pilot specified the type of radar assistance he desired by acknowledging that he wished an IFR approach to GPA.

27. The request to advise leaving altitudes meant that the Cessna should have advised Approach Control as it cleared 11,000 feet, 10,000 feet, 9,000 feet, 8,000 feet and every additional

1,000 feet of altitude cleared on its descent.

28. The Cessna pilot never reported leaving his altitudes after 11,000 feet.

29. At 3:52:37, one minute after acknowledging he wanted an IFR approach, the pilot reported establishing a 290° heading.

30. The instrument landing runway at GPA was runway 28 which had a heading of 280°. The controller gave the Cessna headings to line it up with runway 28, the instrument landing runway, in accordance with the desired IFR approach.

31. At the time (3:54:41) of N5138E's last intelligible transmission, Approach Control attempted to instruct the aircraft to change its heading from 290° to 300°, to compensate for what, in the judgment of the controller tracking it, appeared to be a slight course deviation caused by wind drift.

32. At approximately 3:55:14, N5138E was observed on radar to be making a 180° turn to the left, contrary to the instruction given previously to turn 10° to the right (from 290° to 300°). Except for an unintelligible or aborted attempt at communication at 3:55:19, the Cessna was never heard from again. There was no reply to the repeated attempts of Approach Control to contact the flight. Subsequently, its wreckage, together with the bodies of Kullberg, Rowe, and Smith, was found strewn about a hillside near Monroeville, Pennsylvania, approximately 22 miles east of GPA and 2 miles east of the position where it was last observed on radar.

33. The rate of descent of the Cessna from 12,600 feet to 11,000 feet in 2 minutes was 800 feet per minute.

34. At the same rate of descent, by 3:55:19 the Cessna would have descended into the solid overcast to an altitude of approximately 7,800 feet (700 feet into the overcast).

35. As of 3:55:19, when obviously in trouble, the Cessna was in the overcast for not more than a minute. This was an insufficient period for it to accumulate a disabling ice formation.

36. In any event, there is no evidence of icing conditions at or above 5,000 feet at that time and place.

37. Icing usually occurs only in clouds. Although the Capital pilot, in the investigational aftermath of the Cessna's crash, reported that his aircraft had accumulated ice in its quick descent from 5,000 to 3,000 feet, there is no evidence of any ice forming on the Cessna at any time. The Cessna was in difficulty before reaching 5,000 feet.

38. During its descent, the Cessna never complained of icing; the Cessna never complained of turbulence; the Cessna never declared an emergency or gave any indication of difficulty.

39. Such F.A.A. rules, regulations, recommendations, or information as applied to the Cessna and Approach Control on the night of January 7th and early morning of January 8, 1961, were set forth in Title 14, Code of Federal Regulations (revised as of January 1, 1961), in the Air Traffic Control Procedures Manual (plaintiff's Ex. 19), United States Standard Manual of Radar Air Traffic Control Procedures (plaintiff's Ex. 20), and Flight Information Manual (plaintiff's Ex. 21). There was no F.A.A. rule or regulation which required an approach controller to question a pilot's qualifications, advise a pilot of the possibility of encountering *forecast* icing conditions, or to inquire if he had deicing equipment.

40. Icing conditions cannot be seen on a radar scope; nor can turbulence or light snow showers. Only heavy precipitation can be seen on a radar scope.

41. The Cessna was required to obtain weather information at its point of departure and could also have obtained it along the route by contacting F.A.A. flight service stations, or by tuning in to the scheduled radio broadcasts of weather information made by such stations.

42. Flight Service Stations such as Akron Flight Service Station served the

function of providing weather information to pilots in flight. The Cessna received all pertinent, available weather information, current and forecast, from the Akron Flight Service Station.

43. Such activities by Flight Service Stations served the additional purpose of freeing approach controllers to devote the maximum time possible to their primary duty, i. e., the employment of radar and navigational guidance to sequence aircraft flying in accordance with IFR rules in such a manner as to prevent mid-air collisions. Paragraph 120 of Plaintiff's Exhibit 19 defines "approach control service" as a service provided for IFR flights. It is notable that the facility was located at GPA in a room called the Instrument Flight Room, where the personnel had no visual reference to aircraft under their jurisdiction.

44. While an approach controller might take time from his normal duties to ascertain from other government employees weather information additional to that furnished him by pilots or by the United States Weather Bureau, there is no evidence that he is required to do so unless such additional information is actually requested by a pilot under his jurisdiction. The Cessna made no such request.

45. In accordance with regular procedure, the approach controller had only the actual prevailing local weather information for GPA, as furnished hourly by the Weather Bureau over its Tel-Auto-graph. That consisted of the hourly sequence and included the ceiling, visibility, temperature, dew point, wind velocity and wind direction. It did not include weather *forecasts*. He possessed no knowledge relating to the height of the overcast, any prevailing icing condition, or turbulence. Nor did he have knowledge of the contents of the flash advisory forecast given the Cessna by the Akron Flight Service Station.

46. The hourly sequence for 0758Z (2:58 A.M., E.S.T.) which was given to the approach controller on the Tel-Auto-graph contained the same "current" Pittsburgh weather as was given to the Cessna by the Akron station. That sequence listed no pilot reports and, hence, no information concerning the top of the overcast or icing conditions actually encountered.

47. There was no F.A.A.-promulgated duty placed upon the controller to transmit weather information except at the time of granting an approach clearance, at which time the altimeter setting and the velocity and directions of the wind had to be given; and also when ceiling for visibility was at or below highest circling minimums.

48. No approach clearance had been given the Cessna, nor was the ceiling and visibility at or lower than the highest circling minimums.

49. A pilot flying VFR "on top" can see any cloud layers beneath him, as well as the horizon they form. If he is informed of the altitude level of the "ceiling", he is in a better position than the approach controller to determine the depth of the overcast.

50. When flying on top of an overcast, moonlight and stars provide visual references. On the night in question the moon rose at 11:43 P.M. on January 7, 1961 and set at 11:21 A.M. on January 8, 1961. At the time of the accident, the moon phase was one day preceding the last quarter, and was at a point approximately 40° above the horizon.

51. There was no F.A.A.-promulgated duty placed upon the approach controller to order the Cessna to another airport under the circumstances of this case.

52. The Flight Information Manual, plaintiff's Ex. 21, advised non-instrument-rated pilots (p. 86) to choose an alternative course of action (if available), *rather than request* radar approach or let down in IFR conditions. It was the pilot's responsibility as a part of his preflight action to determine the availability of an alternate course of action. See: 14 C.F.R. § 60.11, footnote 8 supra, and

compare 14 C.F.R. § 60.41.[9] If an alternative course was not previously determined or available, the Cessna pilot should then have advised Approach Control that he was not instrument-rated and declared an emergency.

53. If the pilot had declared an emergency, the controller could have ascertained the nature of the emergency and then, as the situation warranted, have adopted one of two courses: (1) he could have given the Cessna priority treatment and the simplest clearances to attempt to effect a landing at GPA; or (2) after determining from information supplied by the pilot and other F.A.A. facilities that a suitable alternate airport was in fact available, directing the Cessna to it.

54. The Flight Information Manual (pp. 47–48) recommended that a pilot fly a triangular pattern if he encountered an emergency and had radio failure.

55. The Cessna did not fly any such triangular pattern.

56. The rules for the pertinent type of radar assistance are set out in sections 1.2(5) and 4, respectively, of plaintiff's Ex. 20. In addition, normal standards of maintaining separation to prevent in-flight collision as set forth in plaintiff's Ex. 19 were used in rendering radar assistance.

57. The Standard Radar Manual (section 4.1) provides that the pilot is responsible for determining whether the approach or landing is authorized under existing weather minimums.

58. By its terms, section 100.7 of plaintiff's Ex. 19, requiring a controller to use his best judgment in giving clearances, was applicable only if no other rules existed. Other rules did exist, as above mentioned.

59. Approach Control's surveillance radar could not reflect the altitudes of the Cessna during its descent.

60. The words "I would like radar assistance in let down" meant to the controller that the Cessna pilot wanted certain compass headings so that he could "let down" or descend to an altitude appropriate for the commencing of an approach.

61. This is done, where no emergency is known to exist, solely by supplying the pilot with headings for directional guidance and traffic separation, while "tracking" his flight by means of the surveillance radar scope.

62. The approach controller inquired if the pilot wanted an IFR approach in order to clarify the type of radar assistance desired and the type of flying entailed thereby.

63. When an aircraft is above a solid overcast, the only way it can land at an airport underneath that overcast is by flying through it, in accordance with Instrument Flight Rules.

64. By affirmatively acknowledging that he wished an IFR approach, the pilot was requesting a clearance to make an instrument flight through the overcast in IFR weather conditions in order to land at GPA.

65. The pilot knew he was VFR on top and would have to fly through the overcast to make a landing.

66. When the Cessna reached a position 1,000 feet above the clouds on his descent, the nature of the flight was changed from one under VFR conditions to one under IFR conditions in accordance with the definition of IFR condi-

9. 14 C.F.R. § 60.41 provided:
"§ 60.41 IFR flight plan.
"Prior to operating in controlled airspace, a flight plan shall be filed with air traffic control. Such flight plan shall contain the following information unless otherwise authorized by air traffic control:
" * * *
"(k) Alternate airport or airports
* * *."

14 C.F.R. § 60.60 provided:
"§ 60.60 Definitions.
"As used in this part, terms shall be defined as follows:
" * * *
"Alternate airport. An airport specified in the flight plan to which a flight may proceed when a landing at the point of first intended landing becomes inadvisable."

tions contained in 14 C.F.R. § 60.30 [10] and 14 C.F.R. § 60.60,[11] and thereafter Kullberg, although not instrument rated, recklessly flew into IFR conditions,[12] and eventually met disaster in the solid overcast.

67. The Flight Information Manual, p. 86, further advised pilots that although the controller could use radar to provide separation from other traffic and navigational guidance to an airport, "the job of flying the aircraft safely still rests with the pilot".

68. There is no evidence that the pilot rejected or questioned any clearance, or requested an amended clearance.

69. Only the pilot was in a position to determine proximity to the tops of clouds so as to determine at what altitude IFR conditions would commence upon his descent. The Flight Information Manual advised that "the pilot must keep the controller advised of the weather conditions in which the aircraft is operating and along its course ahead" (p. 86).

70. The pilot neither advised the controller of weather conditions nor did he advise him of his altitudes after leaving 11,000 feet.

71. The Flight Information Manual further advised that "authorization to proceed in accordance with such radar navigational assistance does not constitute authorization to the pilot to violate the Civil Air Regulations" (p. 86), thereby placing the pilot on notice that traffic control service to aircraft did not relieve him of responsibility for safe operation of the aircraft.[13]

72. The aircraft sustained damage and in-flight breakup prior to impact due to heavy positive loads on the aircraft. Loads or loading refers to aerodynamic forces of air encountered by the aircraft while in flight.

73. Most probably, the pilot became disoriented upon entering the overcast, losing his visual references and control of the aircraft.

74. It is most probable that the aircraft broke up in flight due to heavy positive loading encountered during a high-speed spiral occasioned by the pilot's loss of control.

75. The Cessna was not equipped for flight in icing conditions.

76. There is no evidence of a breach of any duty owed by the approach controller to the occupants of the Cessna.

---

10. 14 C.F.R. § 60.30 provided:

"§ 60.30 Basic VFR minimum weather conditions.

"[A]ircraft shall not be flown VFR in weather conditions below those specified herein.

"(a) Clearance from clouds—(1) In controlled airspace. Aircraft shall not be flown VFR less than 500 feet vertically under, 1,000 feet vertically over, and 2,000 feet horizontally from any cloud formation, except that in the continental control area, aircraft shall not be flown VFR less than 1,000 feet vertically and one mile horizontally from any cloud formation. * * *."

11. 14 C.F.R. § 60.60 provided:

"§ 60.60 Definitions.

"As used in this part, terms shall be defined as follows:
" * * *

"IFR conditions. Weather conditions below the minimum. prescribed for flights under VFR.
" * * *."

12. 14 C.F.R. § 60.12 provided:

"§ 60.12 Careless or reckless operation.

"No person shall operate an aircraft in a careless or reckless manner so as to endanger the life or property of others.

"Note: Examples of aircraft operations which may endanger the lives or property of others are:
" * * *

"(e) An operation conducted above a cloud layer in accordance with VFR minimums which results in the pilot becoming involved in instrument flight, unless the pilot possesses a valid instrument rating, the aircraft is properly equipped for instrument flight, and all IFR requirements are observed."

13. 14 C.F.R. § 60.2 provided:

"§ 60.2 Authority of the pilot.

"The pilot in command of the aircraft shall be directly responsible for its operation and shall have final authority as to operation of the aircraft. * * *."

77. There is no evidence that Michael J. Ego, manning the Pittsburgh Flight Service Station during the early morning hours of January 8, 1961, breached any duty of care owed by him to the occupants of the Cessna.

78. There was no act or omission to act on the part of defendant's employees which could be deemed to be negligent under the circumstances of this case.

79. In any event, there was no causal connection between any alleged act or omission to act on the part of any of defendant's employees and the crash of the Cessna, whether the Cessna's in-flight breakup was due to pilot disorientation (as we find) or to a disabling accumulation of ice; Kullberg possessed all available information pertaining to flying conditions and better than any other person knew whether he and the aircraft were equipped to fly in same.

80. The following negligent acts or omissions to act, committed by Kullberg in the operation of N5138E, cumulatively constituted the sole proximate cause of the harm sustained by him:

(a) Taking off from Chicago, or permitting such takeoff, when he as pilot in command was not instrument rated and knew or should have known that the Cessna would have to fly through a deep overcast in order to land at Greater Pittsburgh Airport;

(b) Permitting the continuation of such flight after receiving the current Pittsburgh weather and flash advisory from the Akron Flight Service Station while en route;

(c) Failing to advise Approach Control at GPA that he was not instrument rated;

(d) Failing to advise Approach Control of the desirability of an alternative course of action to IFR flight, pursuant to the Flight Information Manual, page 86;

(e) Failing to declare an emergency in accordance with the Flight Information Manual, page 86;

(f) Descending into a solid, deep overcast under the circumstances;

(g) Accepting the clearances given by Approach Control;

(h) Failing to advise leaving altitudes;

(i) Failing to advise Approach Control of weather conditions encountered during descent.

81. Even if, contrary to the court's finding, the crash of N5138E was due to an encounter with disabling icing conditions, the following negligent acts or omissions to act, committed by Kullberg in the operation of the Cessna, cumulatively constituted the sole proximate cause of the harm sustained by Kullberg:

(a) Taking off from Chicago, or permitting such takeoff, when Kullberg as pilot in command knew that the aircraft lacked deicing equipment and knew or should have known before take-off that the Cessna might encounter moderate icing conditions in descending through the overcast to a landing at GPA;

(b) Permitting the continuation of such flight after receiving the current Pittsburgh weather and flash advisory from the Akron Flight Service Station while en route;

(c) Failing to advise Approach Control at GPA that the Cessna lacked deicing equipment;

(d) Failing to advise Approach Control of the desirability of an alternative course to flight into IFR conditions which very possibly contained moderate to severe icing;

(e) Descending into such an overcast under the circumstances;

(f) Accepting the clearances given by Approach Control;

(g) Failing to advise Approach Control of weather conditions encountered during descent.

82. If any act or omission by the defendant's employees was negligent and a proximate cause of the Cessna's crash (contrary to our finding), then we find that each of the negligent acts and omissions committed in operation of the aircraft, above enumerated, contributed in

substantial degree to the harm sustained by Kullberg.

## DISCUSSION
### CAUSE OF IN-FLIGHT BREAKUP.

In the final analysis, plaintiff cannot recover whether the in-flight breakup resulted from pilot disorientation or an encounter with icing conditions inasmuch as we find that neither was the product of a breach of any duty owed by the defendant's employees. However, we find that the most probable cause of the breakup was the application to the Cessna of heavy positive "loads" (aerodynamic forces) produced during a spiral at high speeds, and that the spiral occurred because the non-instrument-rated pilot became disoriented upon entry into the solid overcast and lost control of the aircraft. Uncontradicted opinion testimony to this effect was given by the Government's three expert witnesses: Edward Day, special assistant to the Chief of the Operations Evaluation Division, Federal Aviation Agency; Obed T. Wells, Designated Manufacturer's Certification Representative and executive engineer of the Cessna Aircraft Company, the manufacturer of N5138E; and Dr. Willis E. Anderson, flight surgeon and staff assistant to the Civil Air Surgeon, Federal Aviation Agency. The only "evidence" reflecting the possible existence of icing conditions is (1) the flash advisory forecast given the Cessna by the Akron Flight Service Station, *predicting* moderate to occasionally heavy icing conditions for the northern third of Ohio, western New York, and western Pennsylvania; and (2) the statement of Capital Airlines' pilot Fox, in his letter, that his Viscount had accumulated ice in his quick descent to 3,000 feet (from the flight level of 5,000 feet theretofore maintained by him). Such evidence is, in our opinion, of insufficient probative value. Fox's letter tends to negative the existence of icing conditions at 5,000 feet or higher altitudes, and the evidence is clear that the Cessna encountered its difficulty at an altitude of approximately 7,800 feet or higher. Indeed, the testimony of Mr. Wells with respect to the stress load capabilities of this type of aircraft indicates a strong degree of unlikelihood that N5138E *could* have been disabled by icing conditions, considering the time element involved.

By order dated May 9, 1963, pursuant to a request for admission, Rule 36, Fed. R.Civ.P., we deemed defendant to have admitted that the in-flight breakup was caused by icing conditions, because it was two days late in serving an objection to that request. Of course, defendant never voluntarily made such an admission. Admissions or denials in response to a request for admission stand in the same relation to the case that sworn testimony bears, and in the face of a preponderance of evidence showing that the crash was caused by the pilot's disorientation, we cannot allow technical considerations to prevail to the detriment of substantial justice. Ark-Tenn Distributing Corp. v. Breidt, 110 F.Supp. 644 (D.N.J.1953), aff'd 209 F.2d 359, 360 (3d Cir. 1954).

Dr. Willis E. Anderson also gave an opinion that the pilot's disorientation was compounded by a mild hypoxia and fatigue. However, we deem the premises supporting this opinion to be too speculative and rest upon our finding of pilot disorientation.

### CONTRIBUTORY NEGLIGENCE.

Plaintiff argues that we cannot find on the facts of this case that Kullberg was the pilot during the flight from Chicago, and, accordingly, that we cannot find him guilty of contributory negligence.

However, it appears sufficiently clear from the Pretrial Stipulation that plaintiff has conceded that her decedent was the pilot upon take-off from Midway Airport and she has certainly produced no evidence tending to show that this condition changed prior to the crash. Even if plaintiff had made no such stipulation, her own deposition contains a myriad of detail relating to Kullberg's "oneness" with the Kullberg Drilling Company and its aircraft that compels us to treat him as the owner thereof and find that as such de facto owner he was

flying N5138E during its final flight. 2 Purdon's Pa.Stat.Ann. § 1482; cf. 75 Purdon's Pa.Stat.Ann. § 1212; Bastian v. Baltimore & O. R. Co., 144 F.2d 120 (3d Cir. 1944); Limes v. Keller, 365 Pa. 258, 74 A.2d 131 (1950). And, of course, even in the *most* unlikely event that Kullberg was only a passenger in the Cessna during the flight from Chicago, we would feel obliged on these facts to give effect to the presumption that he was in control of the aircraft and barred from recovery by the contributory negligence of the pilot. Beam v. Pittsburgh Rys. Co., 366 Pa. 360, 77 A.2d 634 (1951), cert. denied 341 U.S. 936, 71 S.Ct. 851, 95 L.Ed. 1364; cf. McCook v. Rebecca-Fabacher, Inc., 10 So.2d 512 (La.App.1942).

It is also noteworthy that the Civil Air Regulations in effect at the time of the crash list under 14 C.F.R. § 43.70 a category of persons known as pilots in command. A "Pilot in command" is defined as "the pilot responsible for the operation and safety of the aircraft during the time defined as flight time". Since Kullberg obviously served in that capacity during the flight to Pittsburgh (made on the business of his corporation), we think that this alone would make him responsible for the operation of the aircraft so as to impute to him the contributory negligence of anyone operating the aircraft at any time during the flight.

We conclude that if, contrary to our findings, any act or omission by the defendant's employees can conceivably be deemed negligent and a proximate cause of the crash, then Kullberg's personal contributory negligence, or that of anyone else piloting N5138E during the fatal flight must bar plaintiff from recovery.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the subject matter of this action. 28 U.S.C. § 1346(b).

2. Venue is laid in this District, in accordance with 28 U.S.C. § 1402(b).

3. Plaintiff's allegations that defendant failed to have a proper weather advisory system for light aircraft and failed to have detailed rules guiding controllers rendering radar assistance to VFR aircraft requesting the same are barred by the "discretionary function" defense interposed by the defendant. 49 U.S.C. § 1421(a)(6);[14] 28 U.S.C. § 2680(a);[15] Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); National Mfg. Co. v. United States, 210 F.2d 263 (8th Cir. 1954), cert. denied 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108; Bartie v. United States, 216 F.Supp. 10 (W.D.La.1963); Blaber v. United States, 212 F.Supp. 95 (E.D. N.Y.1962); Braniff Airways, Inc. v. United States, 203 F.Supp. 602 (S.D.Fla. 1961).

4. Pittsburgh Flight Service Station personnel breached no duty to the occupants of the Cessna in the circumstances of this case to transmit weather information to the Cessna or to Approach Control.

5. An approach controller has no duty to determine either the qualifica-

---

14. 49 U.S.C. § 1421 provides:
    "§ 1421. Powers and duties of Administrator—Minimum standards; rules and regulations
    "(a) The Administrator is empowered and it shall be his duty to promote safety of flight of civil aircraft in air commerce by prescribing and revising from time to time:
    "* * *
    "(6) Such reasonable rules and regulations, or minimum standards, governing other practices, methods, and procedure, as the Administrator may find necessary to provide adequately for * * * safety in air commerce."

15. 28 U.S.C. § 2680 provides:
    "§ 2680. Exceptions
    "The provisions of this chapter and section 1346(b) of this title shall not apply to—
    "(a) Any claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

**800**

tions of a pilot to follow clearances for a type of flight requested by the pilot, or whether the aircraft piloted has suitable equipment for such type of flight. Martens v. United States, 5 Avi. 17,465 (S.D. Cal.1957).

 6. There is no duty for an approach controller to volunteer weather information to an aircraft under his jurisdiction, except in accordance with paragraphs 265.1 and 265.2 of plaintiff's Ex. 19, or if he has previously given such aircraft dangerously inaccurate or misleading information, or perhaps unless he has actual knowledge of a hazardous current weather condition which the aircraft may encounter in flight and of which it may not yet be aware. Air Traffic Control Procedures Manual, ATM–2–A, Federal Aviation Agency, Nov. 1, 1960; cf. Bright v. United States, 149 F.Supp. 620 (E.D.Ill.1956); Smerdon v. United States, 135 F.Supp. 929 (D.Mass.1955); Johnson v. Western Air Express Corp., 45 Cal.App.2d 614, 114 P.2d 688 (1941).

7. The approach controller owed no duty to Kullberg or any other occupant of the aircraft in the circumstances of this case to initiate an inquiry to N5138E concerning the advisability of a landing at an alternate airport, or to order the pilot to do so, in the absence of any declaration of emergency or other indication of difficulty made to him by the pilot.

8. The approach controller owed no duty to Kullberg, in the circumstances of this case, to make special inquiry among other government personnel concerning the possible existence of significant weather information not already supplied to Approach Control.

 9. The defendant, acting through its employees at Greater Pittsburgh Airport and Pittsburgh Flight Service Station, breached no duty of care owed to the occupants of the Cessna.

10. Even if any alleged act or omission of the defendant's employees can conceivably be deemed negligent and a proximate cause of the Cessna's crash, Kullberg is barred from recovery by reason of contributory negligence in operation of the aircraft. Not the least of the acts of contributory negligence so barring recovery was Kullberg's deliberate recklessness in flying into a solid overcast too hazardous for flight by non-instrument-rated pilots.

11. Plaintiff has failed to prove by a fair preponderance of the evidence that any of defendant's employees were the negligent cause of the accident.

12. Plaintiff is not entitled to the relief sought; defendant is entitled to judgment dismissing plaintiff's action on the merits.