Thomas G. SOMLO et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Nos. 64 C 2179, 65 C 5.

United States District Court
N. D. Illinois, E. D.
June 23, 1967.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Donald Parker, and McKay, Moses, McGarr & Gibbons, Chicago, Ill., for plaintiffs.

Edward V. Hanrahan, U. S. Atty., Chicago, Ill., John Adler, Atty., Dept. of Justice, Washington, D. C., Arthur Rissman, Asst. U. S. Atty., Chicago, Ill., for the Government.

MEMORANDUM OPINION

MAROVITZ, District Judge.

This case, brought against the Government under the Federal Tort Claims Act (28 U.S.C. Sec. 1346(b) ), arises out of the crash of a Cessna 310, twin-engine light plane, which occurred in Chicago on January 2, 1963, about eight miles east of O'Hare Airport. The pilot in command was Thomas G. Somlo, one of the plaintiffs. The plane was owned by Somlo's corporation, Progress for Vending, Inc., another plaintiff herein. In addition to Mr. Somlo, aboard were his wife Ginette, their two small children, his mother-in-law, and the family maid. Only Mr. Somlo and his younger daughter Terri survived the tragic accident. Subsequent to the filing of suit by Mr. Somlo and his company (No. 64 C 2179), the Exchange National Bank of Chicago, acting as administrator of the estates of Ginette Somlo, and daughter Susan Somlo, and as guardian of the estate of Terri Somlo, also filed suit against the United States (No. 65 C 5). The cases were consolidated for trial, and the issues were tried at a relatively lengthy trial concluded on May 12, 1967.

The crash occurred because of icing conditions in the atmosphere, which caused a 1½ to two inch crust of clear and rime ice[1] to develop on the plane, and eventually caused it to lose altitude and crash. The plaintiffs contend that employees of the Federal Aviation Agency were negligent in allegedly failing to furnish the pilot with weather information which would have alerted him to the icing conditions prevailing in the Chicago area.

The Government essentially replies that plaintiffs have failed to show that the Government owed any duty to them,

1. As defined by Mr. Morgan, a government weather expert; clear ice is smooth and clear in color, and is generally formed from large rain droplets which freeze upon contact with the plane; rime ice is more granular and is usually formed from small rain droplets which freeze upon contact with the plane.

or if a duty did exist, that the Government did not breach it. In addition, the Government charges that the pilot Somlo's negligence was solely responsible for the accident.

### THE FACTS

The facts, as developed at trial, went into considerable detail. It will be fruitful, in order to gain a proper perspective of the issues herein, to set forth those facts.

The ill-fated plane departed from Naples, Florida, at approximately 9:00 a.m. CST, on January 2, 1963, on a flight to O'Hare Airport, Mr. Somlo's home base. Prior to departure, Mr. Somlo telephoned to the Fort Myers, Florida, Weather Bureau station to obtain the weather information for the area along his route of flight and for the Chicago area. He was informed that the weather along the route would be favorable with visual flight conditions to prevail at each station on the way. He was told that it was snowing in Chicago but that at the time of expected arrival at Chicago, the weather would be clear with temperatures at or below freezing, and that a landing could be made under visual conditions.

While aloft, he requested weather information from the Tampa, Florida, and Atlanta, Georgia, Flight Service Stations. He was given essentially the same information as Fort Myers had provided, except that from Atlanta, the 6:00 p.m. terminal forecast for Chicago included a prediction of light snow. The aircraft landed at Chattanooga, Tennessee, at noon (CST), for gasoline, and lunch for the passengers. It was on the ground for approximately an hour. Before taking off, Mr. Somlo personally went to the Weather Bureau offices and checked the current weather en route to Chicago and the terminal forecast for O'Hare Airport. Favorable weather with visual conditions at O'Hare at the estimated time of arrival was predicted.

The aircraft took off from Chattanooga under Mr. Somlo's command with the same passengers aboard, and continued to proceed under Visual Flight Regulations (VFR).

At approximately 2:35 p.m. (CST), the pilot contacted the Bowling Green, Kentucky, Flight Service Station and requested en route weather and the weather for the Chicago area. Mr. Hamm, the Bowling Green attendant, an employee of the Federal Aviation Agency, supplied the current weather information for Evansville, Terre Haute, Indianapolis, and O'Hare, as well as the terminal forecasts for Terre Haute and O'Hare. The current weather sequence for O'Hare predicted snow grains and freezing temperatures, the snow having begun at 1:38 p.m. The O'Hare terminal forecast, which had been issued at 12:40 p.m., predicted light snow for 6:00 p.m. although not for 2:00 or 4:00 p.m.

At that time there was a light aircraft advisory (hereinafter called Advisory Delta) pertinent for the Chicago area between 1:25 and 5:25 p.m., which stated:

"Advisory for light aircraft Delta. Over Wisconsin, northern Illinois, Southern ⅔ Lake Michigan, north third Indiana *local moderate icing in clouds and precipitation.* Tops of lower clouds western Wisconsin, western Illinois 3000 to 5000 feet sloping to 7000 and 9000 feet over eastern Wisconsin, north-eastern Illinois, north third Indiana. Northwestern Wisconsin and locally over north central and north-eastern Illinois ceilings below 1000 feet and visibilities below 2 miles in fog *with occasional light snow or freezing drizzle.*" (emphasis added)

There is a crucial dispute in the evidence as to whether the above advisory was given to the pilot by Mr. Hamm. The Government's expert on flight traffic control, Mr. Ridgway, testified that it should have been given. Mr. Somlo denies that he received it. Mr. Hamm testified that he remembered furnishing it to the pilot. Although there is no transcript of communications between the pilot and the Flight Service Station,

Somlo's plane's number N5338A, was noted by Mr. Hamm on the Bowling Green copy of the Advisory. Mr. Hamm testified that this was the way a record is kept of such information given to a pilot. In fact, numbers of other aircraft which were given the information were noted on the Advisory.

The testimony indicated, and the parties do not dispute that icing conditions are of grave concern to aircraft pilots, and are considered one of the greatest weather risks to an in-flight aircraft. The icing adds weight to the plane, in some cases of such magnitude that airspeed cannot be maintained even with full power, so that inevitably the plane is forced to the ground. The evidence indicates that planes with de-icing equipment can fly relatively unhindered in light icing conditions, but may encounter trouble in moderate icing, and cannot stay airborne in heavy icing conditions. Planes without de-icing equipment run grave risks by flying even in light icing conditions.[2]

Mr. Somlo's plane contained no de-icing equipment. Thus if Advisory Delta was given to him, it should have constituted a clearcut warning to him to avoid the area covered thereby. Furthermore, the last sentence of the Advisory, indicating a ceiling under 1000 feet with occasional light snow or freezing drizzle, would have been indicative, in and of itself, of inclement weather, possible icing, and probable instrument flight regulations (IFR).

After communicating with Mr. Hamm at the Bowling Green Flight Service Station, Mr. Somlo continued to proceed under visual flight conditions. At approximately 3:55 p.m., when in the vicinity of Danville, Illinois, he made radio contact with the Lafayette, Indiana, Flight Service Station and requested O'Hare weather. He was given the current weather sequence for O'Hare, which indicated a measured ceiling 600 feet broken, four miles visibility in smoke, temperature of 31 degrees, dew point of 27, and wind out of the south at 10 knots. Additionally, the sequence indicated that the snow grains had ended at 2:07 p.m. (CST). The Government also alleges that Mr. Somlo was advised of "freezing precipitation" in the Chicago area, based on the sequence report for Joliet, Illinois for 3:00 p.m. (CST). According to the Government, the Joliet weather is normally included when weather information for the Chicago area is furnished from Lafayette, and it allegedly was communicated in this instance.

Mr. Somlo denies that Lafayette informed him of freezing precipitation. Furthermore, he argues that at the time he contacted Lafayette, there was a crucial amended forecast available which predicted icing in the Chicago area, but which was not given to him. The amended forecast read:

"Applicable 3:20 PM CST to 11:00 PM CST ORD (O'Hare) ceilings 600 feet broken 2500 overcast visibility 4 miles in smoke occasionally 3 miles *in freezing drizzle* * * * snow grains 9:00 PM CST ceiling 1200 feet overcast visibility 3 miles in fog and smoke blowing rain fog and smoke". (emphasis added)

Nor according to Mr. Somlo, did the Lafayette attendant, Mr. Caton, supply him with Advisory Delta, which was still in effect.

2. The Civil Air Regulations are explicit in warning of the dangers of icing. They prohibit most flying in such conditions. In 14 C.F.R. Sec. 135.85(b) and (c) it is stated:
"(b) No pilot may fly—
(1) Under IFR into known or forecast light or moderate icing conditions; or
(2) Under VFR into known light or moderate icing conditions; unless the aircraft has functioning deicing and anti-icing equipment protecting each rotor blade, propeller, windshield, wing, stabilizing or control surface, and each airspeed, altimeter, rate of climb or flight attitude instrument system.
(c) No pilot may fly an aircraft into known or forecast heavy icing conditions.

Mr. Ridgway, the government expert mentioned above, testified that he had familiarized himself with the procedures and regulations applicable at the time of the accident, and had studied Government records with respect to the incident, and had in this way conducted a personal investigation of the activities of the Flight Service Stations in connection with this accident. He testified that it was the duty of the attendant to give the Advisory and amended forecast of freezing drizzle to the pilot if he had them. He also testified that he found no reason to conclude that Mr. Caton would not have had them. Mr. Caton was not called as a witness by either side.

Apparently because of the likelihood of prevailing instrument flight regulations from Danville to Chicago, Mr. Somlo filed an instrument flight plan with the Lafayette Flight Service Station.[3]

From that point on, Mr. Somlo was subject to instrument flight regulations (IFR). The written flight plan (Def. exh. R, and Pl. exh. 22) was prepared by Mr. Caton on an official government form provided for that purpose. It indicated an estimated true airspeed of 150 knots, and destination O'Hare. The route of flight was Victor Airway 171 to the Peotone "OMNI" (V.O.R.) (Very High Frequency Omni) (Directional Range Radio Transmitting Station), and from there via Victor Airway 53 to Mid-way Airport in Chicago, and on to O'Hare, *or* "per ATC" (Air Traffic Control). Estimated time en route was 48 minutes and three hours of fuel was on board. The pilot's name is indicated as "Somlo P.". The home address of the aircraft is listed as ORD (O'Hare), but the number of persons aboard is stated to be "1". According to the written plan the pilot was advised to report passing the Danville V.O.R. to the Chicago Air Traffic Control Center (hereinafter known as Chicago Center), which is located in Aurora, Illinois, and which clears and directs aircraft into the Chicago metropolitan area. There is no alternate airport listed on the written flight plan.[4]

Mr. Somlo, however, testified that he specified Rockford, Illinois, as his alternate airfield to Mr. Caton, and that the words "or per ATC" were not in accordance with his plan as given to Mr. Caton by radio. "Or per ATC" meant that Chicago Center could direct Mr. Somlo to O'Hare via his prescribed route, *or* via any route that the controllers chose.

The conversation between Mr. Somlo and Mr. Caton was not recorded but the written flight plan as prepared by Mr. Caton was admitted into evidence as previously noted. The flight plan was given to the Chicago Center by Mr. Caton via a radio frequency not available to the

3. Mr. Somlo was a licensed pilot who had held an instrument flight rating for over eight years prior to the flight. He was licensed to carry passengers for hire under instrument conditions in single engine planes. However, at the time of this flight he did not have a rating which permitted him to carry passengers in a multi-engine aircraft. Thus he was not permitted to carry passengers in the twin-engine Cessna 310 used for this flight. See Somlo v. Civil Aeronautics Board, et al., 367 F.2d 791 (7th Cir. 1967).

4. Pilots were required, at the time of the crash, under 14 C.F.R. Sec. 60.11 (the Civil Air Regulations) to file an alternate destination plan when flying in instrument flight conditions. That section provides:

"Sec. 60.11 Preflight Action
Before beginning a flight, the pilot in command of the aircraft shall familiarize himself with all available information appropriate to the intended operation. Preflight action for flights away from the vicinity of an airport, and for all IFR flights, shall include a careful study of available current weather reports and forecasts, taking into consideration fuel requirements, *an alternate course of action if the flight cannot be completed as planned,* and also any known traffic delays of which he has been advised by air traffic control." (emphasis added)
Section 60.11 has since been amended. However, the substance has not been changed. It is now in effect as 14 C.F.R. Sec. 91.5.

pilot. He said, *inter alia*: (transcription of the tape recording)

"LAF FSS : Nan Five Three Eight Alpha, a Cessna three ten, speed a hundred and fifty, he's estimating Danville on the hour, twenty two hundred. He's presently VFR at three thousand requesting three thousand over Danville, Victor one seventy one Peotone and any routing you can give him after Peotone, landing O'Hare. He says forty eight minutes en route * * * * * * * * * *

And he's got everything you can name aboard the aircraft.

CHI ARTCC : Well that's good cause he may need it, advise him to con-report passing Danville to Chicago Center on one two one point four."

Plaintiffs contend that Mr. Caton gave an erroneous flight plan to the Chicago Center which had the effect of clearing Mr. Somlo only to Peotone, a point inside the instrument flight regulations condition, and from there either via Victor 53 to Midway, *or* anywhere he might be directed by the Chicago Center, rather than *only* via Victor 53 to Midway and on to O'Hare.

There was no further contact with the Lafayette station, and Mr. Somlo reported to the Chicago Center on the assigned frequency at 4:03 p.m. while passing the Danville V.O.R.[5] He was cleared to the Peotone OMNI on Victor 171 at 3000 feet by Mr. Gustin of the Chicago Center and was advised to contact the Center on another frequency. He did so and was directed by Mr. Riddle of the Center to report passing Peotone.

Mr. Riddle observed a target on his radarscope approximately $3\frac{1}{2}$ minutes later which was in a position approximately five miles north of the Peotone OMNI. He asked Mr. Somlo if he had just gone by Peotone and was answered affirmatively. He then directed Mr. Somlo to fly southeast and cleared him to the Lowell, Indiana, intersection.[6]

At approximately 4:34:50 p.m. (CST), Mr. Riddle gave Mr. Somlo a clearance to climb and maintain 6000 feet. Mr. Somlo left 3000, but approximately 45 seconds thereafter, between 4000 and 5000 feet, he reported that he was picking up ice very badly and requested clearance to remain at 3000 feet. The request was granted and he returned to 3000 feet.

Apparently, the reason the pilot was directed to Lowell and to ascend was because this was the routine manner of handling aircraft arriving from the south. The departure patterns at O'Hare required incoming aircraft to ascend to 6000 so that outbound aircraft could "tunnel" out at the 3000 foot altitude.

At approximately 4:37:50 p.m. (CST), Mr. Riddle cleared Mr. Somlo to the Chicago Heights V.O.R., and told him to maintain 3000 feet. At 4:42:10 p.m., he was advised to hold south of Chicago Heights V.O.R. on Victor 7, to maintain 3000 feet with right turns and to expect an approach clearance into O'Hare at 5:34 p.m., or fifty-two minutes later.

5. In order to clarify, there are several categories of air traffic controllers. They include air traffic control center controllers, such as the ones at the Chicago Air Traffic Control Center, who direct aircraft to and during their holding patterns and clear them for approach to an airport. Also there are approach controllers, who operate from the airport itself, and who guide the plane on its approach pattern, until relieved by the local controllers, the third category, who direct the plane in the latter stages of its approach and while on the ground.

6. Some confusion arose at this point. Somlo thought he had been cleared to the Polo intersection, which is northwest of Chicago and constitutes a holding pattern for the Rockford airport. He apparently understood "Lowell" to be "Polo". The misunderstanding was cleared up through the friendly intervention of a Captain Brown, pilot of a nearby TWA flight, who happened to hear the exchange between the Center and Mr. Somlo.

According to the transcription of the tape, admitted into evidence as Government Exhibit E, Mr. Somlo said: "Ah say again time that'll be over an hour". The clearance was then repeated to him and he gave a correct readback and acknowledgment.

Mr. Somlo testified that at this point, when informed of the long hold, he requested immediate clearance. He said that he told the Center: "Cannot accept your EAC (Estimated Approach Clearance) due to icing conditions and lack of safety gas tiny tim." This does not appear on the transcription of the tape. Mr. Riddle vigorously insisted that Mr. Somlo never made that statement, or gave any other indication of an emergency situation, or indicated an inability to maintain the long hold at Chicago Heights.

However, Mr. Somlo's version was partially supported by Captain Brown, a TWA pilot, called as plaintiffs' witness, who said that he was on the same frequency and recalled Mr. Somlo complaining to the Center about icing badly and not having enough safety gas for the long holding pattern. He did not recall hearing the term "tiny tim", which Somlo said meant a "minor emergency", and although Brown is an experienced pilot, he disclaimed any knowledge as to the meaning of that term. Mr. Riddle likewise claimed no familiarity with the term. Plaintiffs offered Captain Brown's testimony in support of their challenge to the accuracy and completeness of the transcription.

In any event, in the next few minutes, Mr. Riddle of the Center co-ordinated with the O'Hare approach control and requested a clearance to O'Hare at 3000 feet for Somlo's aircraft. Mr. Riddle also advised that the aircraft was holding at the Chicago Heights V.O.R. and was in a turn southbound approximately one mile east of the Heights. In addition, he stated: "Yes he's picking up ice", to which approach control replied, "oh boy". Riddle was then advised by the co-ordinator at O'Hare to have the aircraft contact the tower on frequency 125.4 MC.

Mr. Rowan, an Air Traffic Control specialist, employed at the O'Hare Control Tower by the FAA, and operating the west departure and south satellite positions, coordinated the arrival of Mr. Somlo at 3000 feet with Mr. Riddle. It was necessary to effect this co-ordination with Mr. Rowan, who was controlling west departures, inasmuch as Mr. Somlo was operating at an altitude normally reserved for departure aircraft. As was previously indicated, arrival aircraft at O'Hare normally come in at altitudes of 6000 feet or above.

Mr. Somlo, as instructed by Mr. Riddle, then contacted Mr. Huffman, an approach controller at O'Hare Control Tower, who cleared him to Beacon intersection via Victor 7 at 3000 feet. Beacon is located above Meigs Field on the downtown Chicago lakefront. Huffman also advised Somlo that he was not in radar contact.

Routine procedures for instrument conditions were employed in transferring control from the Chicago Center to O'Hare approach control. It was the function of the Center to give initial clearance to aircraft entering its zone of control. It then routed the aircraft to a position where it could be turned over to the approach control personnel at the intended terminal, who gave instructions concerning actual landing approach. The Center could not clear an aircraft beyond Chicago Heights without prior approval by O'Hare approach control.

While at Chicago Heights, Somlo's aircraft was visible on the radar used by the Chicago Center, but was not visible on the radar used by the traffic controllers at O'Hare. The testimony indicated that O'Hare radar coverage began at a line designated Victor Airway Six, an east-west line intersecting the City of Chicago at about 55 blocks south of the center of the city.

There is a conflict as to the reason Somlo was immediately cleared to the

Beacon intersection, out of the Chicago Heights holding pattern, and directly into O'Hare ahead of other planes waiting at the Heights. Mr. Somlo contends that he *had asked* for preferential treatment, because of his icing problem and lack of safety gas. He asserts that if he had not requested special handling there would be no explanation as to why he was immediately cleared when just previously he had been advised of a 52 minute wait.

The Government insists that Mr. Somlo never asked for such treatment, or refused the estimated approach clearance, or declared an emergency. It argues that Somlo was cleared prior to other aircraft primarily because his location conflicted with normal departure patterns from O'Hare. It explains that when the Center co-ordinated his clearance with the O'Hare approach controllers, the approach controllers decided to bring him in to avoid delay to departing aircraft. Because the Center had no authority to clear his plane to land, its controllers routinely assigned it a place in line behind the other aircraft waiting at Chicago Heights. The decision therefore, to clear the plane for a landing was made by O'Hare approach control, while the earlier holding instruction came from the Center, prior to its contacting approach control. This the Government contends, explains the deviation from the previous indication of delay. In addition, it concedes that Mr. Riddle had told the approach controllers of Mr. Somlo's prior icing problems and admits that this may have played a factor in bringing him in early.

At approximately 4:47:58 p. m. (CST), while Mr. Somlo was proceeding up Victor 7 to Beacon intersection, Mr. Huffman advised him that he would be on a vector to the 14 right ILS final approach course to land on runway 14 right. He further advised that the weather was 500 feet overcast, visibility 2½ miles, wind south-southeast at 5 knots and altimeter 30.13. He then directed Mr. Somlo to 350 degrees and to report crossing Victor 6. Somlo acknowledged this instruction.

At approximately 4:50 p. m. Mr. Huffman asked Mr. Somlo for his heading and was advised that he was on a heading of 010 degrees. Somlo then made an identification turn in order to make radar contact with O'Hare. He was then turned back to a heading of 360 degrees.

At approximately 4:57:55 p. m., in response to a query from Mr. Huffman, Somlo advised him that he had turned to a heading of 350 degrees because he had iced up a little bit and had a little problem straightening out.

At approximately 5:00:50 p. m., Somlo was asked for his current heading and he advised 350 degrees. At approximately, 5:02:30 p. m. Huffman again asked for a heading. A garbled response was received which Huffman did not understand at the time, but which now appears from the tape to be: "8 alpha icing up terribly, can you help me sir?" Huffman on several occasions asked the aircraft to repeat but received no response.

Apparently as the aircraft proceeded northwest toward O'Hare, it began to encounter areas of freezing rain and picked up ice very rapidly. The aircraft was unable to maintain airspeed even at full throttle, and began to lose altitude. Approximately eight miles east of O'Hare, the craft broke out of the overcast which was about 500 feet above the ground. The pilot tried to make an emergency landing in a park, but as he came near he saw that it was a skating rink filled with children, so he tried to make it to another open area. But a wing struck a telephone pole, the aircraft spun and struck a brick residence.

Plaintiffs allege that the negligence of the FAA air traffic controllers and Flight Service Station attendants was the proximate cause of the crash. Specifically, they contend that Somlo was never warned of the icing conditions existing in Chicago, that without his consultation, his flight plan was improperly altered, and finally that the employees failed to utilize their full facilities in advising and guiding the pilot after he reported that

he had encountered icing and desired an immediate clearance.

## THE FINDINGS—FACT AND LAW

### 1. *Did the Government Have a Duty to Defendant?*

The doctrine of a governmental duty to warn persons who rely on services which it has created, of changed circumstances, was born in Indian Towing Company v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). The Supreme Court held the government liable under the Federal Tort Claims Act for failure to keep a lighthouse in good working order after inducing reliance upon it. The Court said: " * * * it is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner". 350 U.S. at 64–65, 76 S.Ct. at 124

The rationale of *Indian Towing* was first extended to air traffic control in Eastern Airlines v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62 (1955), and subsequently has spawned a number of recoveries based upon negligent conduct by air traffic controllers. The theory goes like this; although the government had no duty to set up a system of air traffic control, once such a system *was* established, it had to be operated in a careful manner.

■■ In any action for negligence, whether against the government for the misfeasance or nonfeasance of its air traffic controllers or Flight Service Station attendants, or otherwise, the plaintiff must not only show that the injury was proximately caused by the defendant's negligent conduct, but that defendant owed a duty to plaintiff in the first place. Franklin v. United States, 342 F.2d 581 (7th Cir. 1965). This is basic, for if there is no duty, there cannot be a breach of duty.

■ In this connection, it is important to note that the liability of air traffic controllers is limited by the holding of Hartz v. United States, 249 F.Supp. 119, 123 (N.D.Ga. 1965), which states:

> "Thus, in order to show negligence on the part of the defendant, the plaintiffs are required to show *that any duty owed by the controller to the Bonanza was in fact spelled out by the standards and procedures contained in the Air Traffic Control manual, and was in fact breached.*" (emphasis added)

This rule of law was affirmed in an unreported decision, also cited by the Government. Kullberg v. United States, 271 F.Supp. 788 (W.D.Pa. March 3, 1964). Furthermore, the *Hartz* case put to rest any notion that the common law creates any other duty "separate and apart from the duty as covered by the manual of procedures".[7]

Although plaintiffs rely upon Ingham v. Eastern Airlines Inc., 373 F.2d 227 (2d Cir. 1967), as establishing a duty upon air traffic controllers to warn of adverse weather conditions, it is significant that the *Ingham* case did not deviate from the *Hartz* doctrine. Specifically, the Second Circuit Court of Appeals upheld the trial judge's finding that the government had breached its duty to accurately report weather conditions, *which was set forth in Sec. 265.2 of the Air Traffic Control Procedures Manual of the FAA.* In that case, the approach controllers failed to report a drop in visibility from one mile to three-fourths of a mile, to a pilot attempting an instrument landing. This failure was deemed to be a proximate cause of the ensuing crash since the changed conditions would have been important to the crew in determining whether to attempt a landing. This was true since the drop in visibility brought conditions close to landing minimums, and, in fact, below Eastern Airlines required landing minimum.

7. No common law duty can be established in this case, because the controlling Illinois law, like the Georgia law which governed in Hartz, provides that federal aviation standards promulgated by statute or regulation shall be followed as the law in Illinois. Chap. 15½, Sections 22.27, 22.29, Ill.Rev.Stat.

In the instant case, the plaintiffs have failed to set forth any affirmative evidence relating to the duties of the air traffic controllers as set forth by their manual. Plaintiffs presented a case based on the testimony of Mr. Somlo and Captain Brown, both of whom related substantially factual presentations. For some reason, plaintiffs did not attempt to secure testimony, or put into evidence, any of the duties prescribed for air traffic controllers by the Air Traffic Control Procedures Manual.

However, the *Hartz* case and the relevant portion of *Kullberg* which reaffirmed it, dealt only with the duties of air traffic controllers. We saw no evidence that the duties of Flight Service Station attendants are spelled out by the aforementioned manual, even though they may be. Although *Kullberg* discussed, in general terms, the duties of such attendants, the court did not address itself specifically to the duties of attendants or the derivation of such duties. In *Kullberg*, the aircraft was attempting to land at Pittsburgh, Pennsylvania, and had contact with both the Pittsburgh Flight Service Station, and the Pittsburgh Air Traffic Controllers. The case did not deal with a factual situation where the alleged negligence of Flight Service Station attendants along the route of flight, caused a crash some time after and some distance beyond the communication between aircraft and station. *Kullberg* and *Hartz* both were concerned with alleged negligence of attendants and controllers at the intended destination which occurred while attempting to bring a plane in for a landing, and did not involve negligence at en route flight service stations, such as it is alleged, occurred at Bowling Green and Lafayette.

Hence, the rationale of those cases, that a duty may only be imposed by the provisions of the Air Traffic Controllers' manual, is not dispositive here, because we are primarily concerned with alleged negligence by Flight Service Station attendants. Neither party introduced evidence of any specific written procedures or regulations governing the duties of attendants. However, Mr. Ridgway, the government air traffic control specialist, mentioned above, testified unequivocally that flight service station attendants have a duty to furnish current weather sequences and light aircraft advisories to pilots requesting weather information. Indeed, the evidence indicates that the primary purpose of such stations is to assist pilots by advising them of current weather data. The nationwide network of flight service stations established by the FAA is relied upon by aircraft pilots as the primary source of such data while aloft and while planning their flights.

As the Indian Towing, Eastern Airlines v. Union Trust, and *Ingham* cases make clear, when the government undertakes to perform services not required by specific legislation, it has a duty to perform them in a careful manner. Thus if Mr. Caton or Mr. Hamm did not carry out their duties in the manner upon which pilots have come to rely, namely by furnishing current and up to date weather data, we think a breach of duty would be established.

In addition, one of the allegations made by plaintiffs relates to the air traffic controllers' failure to use their full facilities to bring Mr. Somlo in after they were aware of his icing problems. Even though plaintiffs introduced no affirmative evidence relating to the requirements of the controllers' manual, we do not think that omission should be fatal, if the evidence as a whole indicates that conduct or inaction of the controllers appears to be the proximate cause of the crash. Assuming the controllers to be at fault, we would be loathe to exonerate the government if its clear misconduct proximately caused the crash, despite the absence of evidence regarding the manual.

From the foregoing, we hold that the Government did have a duty to furnish up to date weather data to Mr. Somlo, and to exercise due care in the performance of its other functions relating to his aircraft.

2. *Assuming a Duty to Exist, Did the Defendant Through its Employees, Breach It, and If So Was the Breach the Proximate Cause of the Crash?*

■ We think that if Mr. Somlo was never supplied with the available weather information which indicated icing conditions and the probability thereof, that he would have a justifiable grievance against the Government. For flight service station personnel are obligated to furnish current weather and forecasts, if available, to "en route" aircraft. Kullberg v. United States, 271 F.Supp. 788 (W.D.Pa. March 3, 1964).

In order to discover whether Mr. Somlo was furnished with such pertinent information, we must commence by considering his disputed communication with the Bowling Green Flight Service Station. As previously related, Mr. Somlo testified that he did not receive Advisory Delta, while Mr. Hamm emphatically insisted that the Advisory was supplied. Mr. Hamm said that he remembered giving the Advisory to Somlo, and, as was routine procedure, noted the plane's number on his copy of the Advisory.

Plaintiffs attacked Mr. Hamm's testimony and showed that the official contact record and an investigatory telegram following the crash did not indicate that the Advisory had been given.

The issue, like several other factual disputes in this case, is essentially one of credibility. We see no apparent reason to disbelieve the testimony of Mr. Hamm. It is, of course, conceivable that he failed to transmit the Advisory and added the plane's numbers to it, after being informed of the crash, in an attempt to avoid blame. However, he has been employed by the FAA for nine years, and there has been no indication that he is anything but a conscientious public employee, dedicated to a responsible task which is made infinitely more important by the realization that people's lives depend upon his successful performance. After observing the witness during his testimony, we are persuaded and believe that the Advisory was given at Bowling Green and that Somlo was informed and knew of the icing conditions ahead. It is our conclusion that Mr. Hamm acted with due care and fulfilled all of his responsibilities to the pilot, Mr. Somlo.

However, it is equally clear that the Lafayette attendant, Mr. Caton did not give to Mr. Somlo either Advisory Delta, or the amended forecast which predicted freezing drizzle for the Chicago area. Mr. Ridgeway testified that such information should have been furnished if available, and that there was no reason to conclude that it was not available. However, there was no substantial evidence presented to show that it was available at that station at that time. The Government's contention that Somlo was advised by Caton of "freezing precipitation" in Chicago, is equally unsupported by the evidence. What is clear is that Somlo never received either the Advisory or the amended forecast at Lafayette. Whether it was available to Mr. Caton is not definitely known. He was not called to testify, a most unsatisfactory and inadequately explained circumstance. Although we do not intimate which party had the burden of calling him, if either, it is unfortunate that events at Lafayette, one of the most crucial points of the flight, were not more fully developed.

On the basis of the evidence that was introduced, we must find that the Advisory and amended forecast were probably available at Lafayette but were not given by Mr. Caton. We further do not believe that he warned of "freezing precipitation". Such conduct by Mr. Caton, clearly amounts to a breach of his duties, as defined by Mr. Ridgway.

Those factual issues having been resolved, we turn to the key issue of the case. Plaintiffs argue that even assuming Somlo was given Advisory Delta at Bowling Green, which we have found, the failure by the Lafayette Flight Service Station to tell him the Advisory was still in effect, vitiated its effectiveness as a warning and was the proximate cause of the crash. They allege that

Lafayette was the crucial point, since had he been given the Advisory and/or the amended forecast at that juncture, he would not have chosen to fly to O'Hare and might have chosen to land where visual conditions prevailed. They argue that it would be logical for a pilot to assume, if the Advisory was not repeated at Lafayette, that it was no longer in effect. Somlo testified that had he known of icing, he would not have flown into the Chicago area.

But, plaintiffs posit, once he made the decision to enter instrument flight regulations, which began south of the Peotone OMNI, he was required to follow the controller's instructions and could not deviate from his assigned clearances without permission. It is theoretically true that he might deviate in an emergency. But, they argue, the evidence indicates that when the emergency developed to the point where deviation became necessary—that is, while the aircraft was proceeding up Victor 7 to the Beacon intersection—there was no practical alternative but to continue on course. There was no evidence that anyone knew in advance, of actual icing conditions between Chicago Heights and O'Hare. And there is likewise no evidence that anyone knew whether routes to alternative airports were any better. Hence, plaintiffs allege, not knowing of any better route, and being advised of none, the pilot had no alternative under instrument conditions but to continue on his assigned clearance and go to O'Hare.

In summary, plaintiffs insist that Lafayette was the critical point regardless of what Somlo learned at Bowling Green. Once he entered IFR conditions, his ability to avoid the danger was practically non-existent, in their opinion.

We think their arguments are unpersuasive. In our judgment, once Mr. Somlo became aware of the possibility of icing, the most deadly of all possible weather conditions for an aircraft, and virtually certain disaster for a plane without deicing equipment, he was under a duty himself to avoid those conditions if at all possible. That duty certainly in-cluded the requirement that he ask if icing was still a factor when he hit Lafayette. And this is especially true, knowing as he did, when switched from Lafayette to the Chicago Center's control, that he was entering instrument flight conditions. We do not think he should have accorded himself the false assurance of assuming the Advisory was no longer in effect. More was required of him than that. If he had asked, and been told that the danger was lifted, a different light might be shed on this case. But he plowed on, seemingly without concern as to the possible icing conditions ahead, apparently determined to reach his home base at all costs.

In De Vere v. True-Flite, Inc., E.D. N.C., April 26, 1967, 268 F.Supp. 226, 228, Judge Dalton indicated that a pilot does have the duty to obtain additional weather information where he has prior information which suggests the need for further inquiry. He said:

"In this regard, we find that the visual observation of the existing conditions *coupled with the knowledge of weather conditions gained earlier that night in his flight into Wilmington, placed upon him the duty to obtain this additional weather information directly from the weather bureau.*" (emphasis added)

In our judgment, even though factually distinguishable, the rationale of *De Vere* dictates the duty which was imposed upon Mr. Somlo to obtain further weather information. As the Court further said:

"Airlines, pilots and those in charge of making decisions on when to fly and when not to fly should be held to a strict accountability for their acts * * * It is common knowledge that bad weather, rain and thunderstorms, fog, snow and windstorms account for a large percentage of airplane accidents. Many of them, like the one here under consideration, could have been avoided by awaiting proper weather conditions."

Although Mr. Caton at Lafayette should have furnished the Advisory

and the amended forecast, his failure to do so was of lesser consequence than Mr. Somlo's failure to inquire regarding the existence of icing, after learning of its probability at Bowling Green. Although Caton's conduct was a breach of duty, we do not think it was a proximate cause of the crash. Mr. Somlo's acts of negligence are of sufficient magnitude to bar the claims of all plaintiffs.

And contrary to plaintiffs' position, Mr. Somlo had plenty of time to undertake an alternate course of action when he first entered IFR conditions at Danville. He could have diverted to any number of airports at that time *or* after he first encountered icing between Peotone and Lowell.[8] And even after he was cleared at Chicago Heights he could have asked to make an instrument approach to Midway Airport in Chicago. That he did not know the relative weather at O'Hare or Midway is no excuse. He certainly could have inquired and done his best *to get his plane out of the air* as soon as possible after first experiencing icing problems. The danger of continuing should have been starkly apparent to Mr. Somlo after he actually experienced an area of icing, if not before, in view of the Advisory given to him at Bowling Green.

 He was not bound to an inflexible flight plan because on instrument regulations. If he had alerted the controllers at the Center, or even O'Hare that because of icing he wished to avoid the Chicago area and land at an alternate site, they would undoubtedly have guided him to another airport. But he did not make that request. And they have no duty to read his mind.

A prudent pilot would have made searching inquiry as to the possibilities of further icing conditions after first encountering them. Yet Mr. Somlo did not make such inquiries, or request to be cleared out of the icing conditions or to an alternate airport, *or even advise ap-*

*proach control that he lacked deicing equipment.* It may be true that when close to Beacon intersection on Victor 7 it was too late to divert to an alternate airfield. But if so, the doing was that of Mr. Somlo, not of the Government's employees. And even at that point he did not declare an emergency.

 It was unfortunate for Mr. Somlo to assume that he was out of danger once he was cleared to descend to 3000 feet after encountering icing between 4000 and 5000 feet. But his assumption and persistence in going on cannot be considered negligent behavior on the part of the Government.

The aircraft was equipped with radio equipment sufficient to pick up the various scheduled weather broadcasts in the Chicago area. While under instrument regulations, the pilot apparently did not check these sources, which would have given current weather and light aircraft advisories, which might have been helpful. However, we are willing to credit the pilot's assertion that he was so busy merely navigating the plane that he had no time in which to perform the time consuming task of switching radio frequencies to pick up these reports. But if he was so busy and was having so much trouble handling his plane due to icing and other adverse weather, he should have told someone of his predicament and requested permission to land as soon as possible at the closest and safest possible alternative airport.

We do not credit his assertion that he refused his estimated approach clearance and indicated his predicament with the cryptic "tiny tim" message. The transcript does not include that message. Mr. Riddle was emphatic in denying receipt of same. And Captain Brown admitted that he had never heard the words "tiny tim." His testimony of a vague recollection, that Somlo had indicated his icing problems and lack of safety gas for the long hold at Chicago Heights,

---

8. Some of the many possibilities to which he could have turned without coming farther were Joliet, Lafayette, Danville, Rockford, Kankakee and South Bend, in addition to numerous small airfields.

is unpersuasive in light of the transcript of communications which does not include this message. We find the transcript controlling on the issue and reject Mr. Somlo's contention. It is clear to us that Mr. Somlo never declared an emergency or even suggested in any terms, that he was in trouble until his last frantic transmission.

Accordingly, even if, as appears probable, he was not given proper weather information at Lafayette, once he was given Advisory Delta at Bowling Green, a high responsibility was imposed upon him. The Court does not believe that he carried out that responsibility.

In this connection, we are mindful that under the law, the pilot has the ultimate responsibility for the safety of the aircraft and its passengers. As stated in defendant's exhibit M, Civil Air Regulations, Part 60.2, which governs this situation: (since amended, but not changed in substance, and published as 14 C.F.R. Sec. 91.3):

"Authority of the pilot. The pilot in command of the aircraft shall be directly responsible for its operation and shall have final authority as to operation of the aircraft * * * In emergency situations which require immediate decision and action the pilot may deviate from the rules prescribed in this part to the extent required by considerations of safety."

That the pilot has the primary responsibility for the safety of his aircraft, is the holding of numerous cases. E. g. United States v. Miller, 303 F.2d 703, 710 (9th Cir. 1962); Wenninger v. United States, 234 F.Supp. 499 (D.Del. 1964), affirmed 352 F.2d 526 (3d Cir. 1965); Allegheny Airlines v. Village of Cedarhurst, 238 F.2d 812 (2d Cir. 1956); Stanley v. United States, 239 F.Supp. 973 (N.D.Ohio 1965); United States v. Schultetus, 277 F.2d 322 (5th Cir. 1960).

From what we have indicated, we do not believe Mr. Somlo adequately fulfilled his responsibilities as pilot in command of his craft.

Furthermore, we are not convinced that Mr. Caton substantially changed Somlo's flight plan when transmitting it to the Chicago Center. Plaintiffs allege that because of this change, of which he was not told, Somlo was not directed by the Center to Midway Airport via Victor Airway 53 and from there to O'Hare, but instead was cleared only to Peotone. He then was directed to fly to Lowell, where he picked up ice, and from there up the Chicago lakefront where he encountered the most severe and fatal icing. They contend that the actions of Lafayette and the Chicago Center acting together had the effect of taking over the routing of the remainder of the flight. Although it is the pilot's responsibility to plan his flight, they argue that this function was usurped by the Government employees without Mr. Somlo's knowledge.

But again this conflict is one of credibility. The written flight plan prepared by Caton provided Victor 171 to Peotone, and from there via Victor 53 to Midway and on to O'Hare, "or per ATC", and included no alternate airfield.

It is true that Caton did not transmit a routing via Victor 53, but told the Center to route Somlo any way it wanted after Peotone. That is undisputed. But since the written flight plan authorized routing via "ATC", which means any route given by the Center, the omission of the Victor 53 routing was not a substantial alteration, in our judgment. In any event, the written flight plan included no alternate destination, as is required by Part 60.11 of the then current Civil Air Regulations.

We see no reason to question the flight plan as recorded by Mr. Caton. On the other hand, we do have reason to question Mr. Somlo's credibility. Aside from observations of demeanor, it is undisputed that Somlo told Caton that only one person was aboard the aircraft, and this was duly noted on the flight plan under "No. of persons aboard". Despite his lame attempts to explain, this discrepancy means only one thing to the Court—that Somlo was not rated to fly with passengers aboard, and that he wished to conceal from official scrutiny that he was

flying with five passengers. Whether his ability to fly the plane was lessened because he lacked a proper rating is not the issue [9]—the issue is one of credibility. We find the attempt on Somlo's part to misrepresent the number of passengers aboard to be very damaging to his credibility. So damaging, in fact, that we are willing to accept as valid, the document prepared by Mr. Catonover Mr. Somlo's testimony that it is inaccurate.

It is not off the mark to say that our view of Mr. Somlo's credibility inevitably affected our finding that he was given Advisory Delta at Bowling Green, and that he did not transmit the alleged "tiny tim" message. We hasten to add that our evaluation of credibility was based not only upon the misrepresentation of the number of passengers aboard, but on demeanor and all the other factors which might influence the trier of fact in judging credibility.

■ Even, however, assuming the flight plan was substantially altered, which we do not believe, we do not think that the accident was proximately caused by the transmittal of an altered flight plan. Although icing conditions were predicted *generally* for the area, there is no evidence that anyone knew, in advance, that icing conditions existed along the *specific* route eventually flown by Somlo, or that in fact, the same conditions were or were not present along Victor 53. Apparently no pilot reports indicated the existence of ice at any specific point along either route. In fact, Mr. Morgan, a government expert witness, testified that although icing conditions were predicted for the Chicago area, no evidence was found during the post-crash investigation to indicate that a temperature inversion was present. If a pilot

knows in advance of a temperature inversion involving low temperatures such as existed on January 2, 1963, he should realize the possibility of freezing precipitation and avoid the area.[10]

No, it was not the transmittal of an altered flight plan which caused the accident, but as we have indicated, Mr. Somlo's negligence in attempting to bring his plane into an area of probable and known icing conditions, in the middle of a notorious Chicago winter.

Finally, we must reject plaintiffs' contention that FAA employees failed to utilize their full facilities in advising and guiding the pilot after he reported that he had encountered icing and desired immediate clearance.

■ In the first place, we have already found that the alleged "tiny tim" message was not sent. As previously noted, the ultimate responsibility for the safety of an aircraft rests on the pilot. No doubt, the United States is liable if negligent acts of air traffic controllers are the direct cause of injury. Eastern Airlines v. Union Trust Co., 95 U.S.App. D.C. 189, 221 F.2d 62 (1955); Ingham v. Eastern Air Lines, 373 F.2d 227 (2d Cir. 1967). But the controllers' duties should not be confused with those of the pilot. In United States v. Schultetus, 277 F.2d 322, 326–327, 86 A.L.R.2d 375 (5th Cir. 1960), the Court said:

"It seems apparent that the district court had an erroneous concept of the functions and duties of the operators of the control tower * * * [t]he theory followed by the district court would place upon the operators of control towers the primary responsibility for the operation of the aircraft at the field. Governmental regulations, having the force of law, have assigned this

9. The evidence, in fact, tended to show that he flew the plane well. There is no contention that the manner in which he actually flew the aircraft contributed to the accident.

10. Mr. Morgan testified that under normal conditions, the temperature decreases approximately 3½ degrees per 1000 feet of elevation. This is known as the lapse

rate. However, where the upper layers of air are warmer than the air below, the lower layer tends to rise and the upper layers to settle, sometimes leading to turbulent conditions and precipitation. When temperatures are near freezing or below in the lower layers, any precipitation falling under such conditions, would tend to freeze as it hits the lower temperatures below.

responsibility to the operators of aircraft."

And in a recent case, the Fourth Circuit agreed that the pilot, not the tower controller, is primarily responsible for the safe operation of the aircraft. Tilley v. United States, 375 F.2d 678 (4th Cir. 1967).

In the instant case, we have indicated that we do not think that Somlo ever gave his "tiny tim" message, in which he purportedly refused his estimated approach clearance. But even if that message was transmitted, the evidence overwhelmingly indicates that the Center and approach controllers fulfilled their responsibilities. There is no evidence that anything could or should have been done by them in addition to the procedures employed in the handling of the aircraft. They allowed Mr. Somlo to return to 3000 feet, the departure altitude, when he complained of icing conditions at Lowell. For whatever reason, they immediately cleared him for a landing from the Chicago Heights V.O.R., ahead of numerous other aircraft stacked up in that holding pattern, and brought him in on a direct routing to Runway 14 right at O'Hare. The controllers gave him position information, issued headings to him, and observed his approach on radar. And they did all this with no indication of an emergency aboard Somlo's plane. For he never declared an emergency.

The controllers do not have the responsibility of determining whether or not a given weather situation is safe for landing. Smerdon v. United States, 135 F.Supp. 929 (D.Mass. 1955). The pilot has that responsibility. Ingham v. Eastern Air Lines, 373 F.2d 227, 237 (2d Cir. 1967). As indicated previously, it is part of his duty to maintain the safe operation of the flight, and to take alternative steps to achieve that safety if necessary. These are not the controllers duties. In this case, the controllers at O'Hare and the Chicago Center performed admirably, and plaintiffs' attempt to pin responsibility for the crash upon them is clearly unfounded in fact.

In the final tragic analysis, it must be said that the major proximate cause of this crash was the negligent conduct of the pilot Mr. Somlo in disregarding Advisory Delta, failing to ascertain whether the forecast for icing conditions was still in effect, and finally disregarding positive contact with those conditions in a regrettable attempt to reach O'Hare. His negligence in the Court's opinion, was the major contributing proximate cause of the deaths and injuries sustained by himself and his family. Even though the failure of Mr. Caton at Lafayette to supply pertinent weather information constituted a negligent breach of duty, Mr. Somlo's negligence was the proximate cause of the crash, and forecloses any recovery from the Government.

We sympathize with Mr. Somlo, and hesitate, in these circumstances, to stigmatize his actions as the cause of a crash which killed virtually his entire family. We wish him to know, although it can be no consolation for his loss, that our decision was made only after carefully weighing all the evidence. And as we view the evidence our duty was clear in this case.

Judgment as to all plaintiffs must be entered for the Government.