OZARK AIR LINES, INC., Plaintiff,

v.

DELTA AIR LINES, INC., and
United States of America,
Defendants.

DELTA AIR LINES, INC., Counterclaim-
ant and Cross-claimant,

v.

OZARK AIR LINES, INC.,
Counter-Defendant,
and
United States of America,
Cross-Defendant.

UNITED STATES of America,
Counterclaimant and Cross-
claimant,

v.

OZARK AIR LINES, INC.,
Counter-Defendant,
and
Delta Air Lines, Inc.,
Cross-Defendant.

No. 69 C 2042.

United States District Court,
N. D. Illinois, E. D.

Oct. 28, 1975.

Frank F. Rox, Delta Air Lines, Inc., Atlanta, Ga., for Delta Air Lines, Inc.

Irving G. Swenson, Peterson, Ross, Rall, Barber & Seidel, Chicago, Ill., for Ozark Air Lines, Inc.

Mark A. Dombroff, Torts Section, Civ.Div., Aviation Unit, Dept. of Justice, Washington, D. C., for United States of America.

## MEMORANDUM AND ORDER

ROBSON, District Judge.

*Stipulated Facts and Findings of Fact*

1. This is an action for damages resulting from the ground collision of two aircraft taxiing at Chicago-O'Hare Airport at Chicago, Illinois, on May 8, 1969, involving an FH–227 aircraft owned and operated by Ozark Air Lines, Inc. and a DC–8–61 aircraft leased and operated by Delta Air Lines, Inc.

2. The above-entitled case was filed by Ozark Air Lines, Inc. against Delta Air Lines, Inc. in the Circuit Court of Cook County and thereafter removed by Delta Air Lines, Inc. to the United States District Court for the Northern District of Illinois, Eastern Division. Thereafter, the plaintiff, Ozark Air Lines, Inc., filed its Amended Complaint and Second Amended Complaint naming as an additional defendant the United States of America. Delta Air Lines, Inc. then filed its Counterclaim and Crossclaim against Ozark Air Lines, Inc. as a counter-defendant and the United States of America as a cross-defendant. Thereafter, the United States of America filed its Counterclaim and Crossclaim against Ozark Air Lines, Inc. as a counter-defendant and Delta Air Lines, Inc. as a cross-defendant. Pleadings in opposition to the Com-

plaint, Counterclaims and Cross-claims were filed and the above heading represents the present posture of the pleadings.

3. On May 8, 1969, Ozark Air Lines, Inc. was the owner and operator of a certain FH–227 aircraft, used by plaintiff in its regularly scheduled cargo flight, known as Flight 001, and was proceeding in a westerly direction on the cargo taxiway shortly after midnight.

4. On May 8, 1969, Delta Air Lines, Inc. was the lessee and operator of a certain DC–8–61 aircraft which had landed on runway 14 left at Chicago-O'Hare Airport shortly after midnight on a regularly scheduled passenger flight from Miami to Chicago, Flight 102, and was proceeding on the bridge taxiway.

5. The United States of America, through the Federal Aviation Agency, its officers, agents, servants and employees, operated the control tower at Chicago-O'Hare Airport on May 8, 1969. Mr. Wallace Pfaff, an FAA employee, was the ground controller in attendance at that time within the scope of his employment.

6. At approximately 1202:05 A.M. or 0502:05 GMT, when clearing runway 14 left, the crew of Delta Flight 102 communicated with the ground controller in the tower on the ground control frequency 121.9 and received a taxi clearance to go over the bridge taxiway and use the outer circular taxiway to the Delta terminal gate.

7. Thereafter, when at the Ozark Cargo Hangar, the crew of the Ozark Flight 001 communicated with the ground controller in the tower on the ground control frequency 121.9 and received a taxi clearance to runway 9 left via the outer circular taxiway.

8. The clearance given Ozark was transmitted on the ground control frequency 121.9 and recorded by the cockpit voice recorder of the Delta aircraft.

9. The Ozark crew did not hear the clearance given to the Delta aircraft since they were not yet in contact with the ground controller.

10. The ground controller in both instances was Wallace Pfaff.

11. It was raining at the time of and immediately prior to the collision.

12. Ozark Flight 001 proceeded from the Ozark Cargo Ramp to the cargo taxiway, turned right, and taxied west on the cargo taxiway.

13. The distance from the end of runway 14 left to the collision point along the taxi route of the Delta DC–8 is 4360 feet.

14. At 1204:05 A.M., seconds before the collision, one of the crew of Ozark 001 saw Delta 102, transmitted "Watch out. Watch out" on the ground control frequency and braked Ozark 001 to a stop.

15. The collision occurred at approximately 1204:55 A.M. or shortly thereafter at or near the junction where the cargo and bridge outer circular taxiways merge.

16. The left wing of Delta 102 passed over the right propeller of Ozark 001. Both wing and propeller were damaged.

17. The crew of Delta 102 never saw Ozark 001. The captain of Delta 102 brought his aircraft to a stop some four hundred and fifty feet beyond the collision point but did not actually know there had been a collision until he parked at the gate and viewed the damaged wing.

18. Expert witnesses for both Delta and Ozark reconstructed the collision and calculated the ratio of the speed of one aircraft to the other. The methods of calculation used by these experts varied, but the speed ratios which they derived were in close agreement.

19. The taxiing speeds of the two aircraft varied little prior to impact. Ozark's expert calculated a speed ratio of 1 to 1.57, while Delta's expert calculated speed ratios of 1 to 1.29 and 1 to 1.34, but all these calculations indicated that Delta 102 was taxiing faster than Ozark 001.

20. The relevant times regarding the ability to see and avoid each other were those times prior to the time of the collision when it was still possible to avoid the collision.

21. Prior to the collision the Delta aircraft was coming from the right rear quadrant of the Ozark aircraft and was behind the right shoulder of the co-pilot of the Ozark aircraft as the aircraft approached the intersection. The Delta aircraft overtook the Ozark aircraft and taxied past the Ozark aircraft without stopping.

22. The crew of the Delta aircraft had the better opportunity to see the Ozark aircraft until the collision became imminent and unavoidable.

23. The ground controller was aware of the fact that these two aircraft would be on a conversion course.

24. The ground controller could have advised the crew of these two aircraft in detail as to the traffic conditions and their relationship to each other without any difficulty whatsoever.

25. Captain Fauser of Ozark had accumulated approximately 20 hours in the FH–227 in a transition or check-out program and was taxiing out for his final FH–227 check flight with Captain Mann of Ozark acting as check pilot when the subject collision occurred. Captain Mann was occupying the right cockpit seat and performing co-pilot duties while as a check pilot he was required to monitor and observe Captain Fauser's performance as a captain. As part of his duties as acting co-pilot, Captain Mann was required to initiate radio calls and communicate with the tower.

26. It was necessary for Captain Mann and Captain Fauser to conduct and complete a "taxi" check-list while taxiing after the Ozark flight departed the cargo area. Performing the duties of co-pilot, Captain Mann called out the check-list items for Captain Fauser's response and action. In addition, Ozark procedures require a "before take-off" check-list performance while taxiing. During taxiing on the cargo taxiway, the Ozark crew maintained continuing communication with the ground controller concerning the taxi route and the selection of a departure runway for Ozark 001.

27. Captain Fauser looked only once to the right as soon as he cleared the cargo facilities. He did not see the Delta aircraft.

28. Mr. Pfaff's duties in the tower as ground controller encompassed supervision of ground movements of aircraft. This supervision included maintaining observation of the airport movement area to the extent possible. Mr. Pfaff did not remember any task on the evening of the accident during the four minutes prior to the collision which would have kept his attention inside the tower cab. During the fifteen-minute period preceding the accident, Mr. Pfaff was working no more than a couple of airplanes, maybe four or five, primarily ground movement.

29. At the time of the accident, Mr. Pfaff was utilizing ground control frequency 121.9 and was communicating with Ozark 001 and Delta 102 on said frequency. Mr. Pfaff saw Delta Flight 102 clear the active runway after landing and observed it proceed over the bridge taxi route in compliance with his instructions until such time as he

could not see it any more due to obstructions to his vision. Both crews were, or should have been, aware of said blind spots.

30. Mr. Pfaff did not observe Ozark 001 at any time prior to the accident, but he knew that Ozark 001 was in the cargo area when he issued his taxi clearance to Ozark. Mr. Pfaff knew the specific route that Ozark would follow to get to the runway if Ozark followed the instructions in his clearance.

31. Mr. Pfaff was aware at the time he issued the taxi clearances to Delta Flight 102 and Ozark Flight 001 that the aircraft would be moving along taxiways not visible to the tower. Further, Mr. Pfaff was aware that the clearances he had issued cleared the two aircraft to follow a route which would converge in an area which he could not observe visually. Mr. Pfaff did not warn either Delta 102 or Ozark 001 at any time that they would be traversing in an area that was not visible to the tower. Mr. Pfaff did not advise either Delta 102 or Ozark 001 at any time of the presence or location of the other aircraft. Mr. Pfaff had ample time to advise both aircraft of their converging courses prior to the accident.

32. Mr. Pfaff did not know what right-of-way rules would be applicable to aircraft arriving at the same time at an intersection of two taxiways equally used.

33. Mr. Pfaff knew how to operate the Airport Surface Detection Equipment (ASDE) radar set available in the tower cab for monitoring and radar observation of ground traffic on the airport premises. At the time of the accident, Mr. Pfaff had not turned the ASDE radar set on. Had he turned the ASDE radar equipment on, he would have seen Delta 102 and Ozark 001 appear on the radar scope. If the ASDE radar set in the tower had been used by Mr. Pfaff, it would have covered or scanned the areas not visible from the tower, and he could have determined the positions and progress of Delta Flight 102 and Ozark Flight 001.

34. As an alternative to the taxi clearance Mr. Pfaff issued to Delta, he could have instructed Delta to taxi to its gate via the bridge taxiway and transition to the inner circular taxiway; thereby, Mr. Pfaff would have avoided the potential conflict of route between the Ozark and Delta aircraft.

35. The government air traffic control expert, Mr. Edmund Burke, testified that in his opinion there would have been no problem or difficulty whatsoever for Mr. Pfaff to have advised the crews of the Delta and Ozark aircraft in detail as to the traffic conditions and their relationship to each other prior to the accident.

36. Had Captain Grant of Delta received an advisory from ground control of another aircraft coming toward the converging point of the taxiways where the accident happened, and he had not visually seen such aircraft, Captain Grant would have stopped and inquired as to the position of the conflicting traffic. Captain Mann of Ozark monitored ground control frequency while taxiing, and if he had heard the communications from ground control to Delta he would have known that the DC–8 would traverse the area of the collision.

37. Captain Fauser of Ozark was not aware of the exact location of the tower's blind spot, though he had heard the tower on previous occasions advise aircraft that they were unable to control a certain area because they could not see it. The ground controller did not at any time advise the Ozark or Delta aircraft that he was unable to see or

control along the Ozark and Delta taxi routes. Prior to the accident, Captain Frankenberger as flight manager for Ozark at O'Hare did not recall seeing any specific information on the location of blind spots from the control tower. However, after the accident an airport map, dated June 11, 1969, showing the actual blind spots was circulated by the FAA to the various airlines.

38. The Terminal Air Traffic Control Manual, 7110.8, is a manual used by all traffic control facility employees, and its provisions are binding upon and mandatory for air traffic controllers in the O'Hare tower, including Mr. Pfaff on the night of the accident.

39. An "air traffic clearance" is defined in the Terminal Air Traffic Control Manual as "[a]n authorization by air traffic control, for the purpose of preventing collision between known aircraft, for an aircraft to proceed under specified traffic conditions within controlled airspace."

40. "Air traffic control service" is defined in the Terminal Air Traffic Control Manual as "[a] service provided for the purpose of promoting the safe, orderly, and expeditious flow of air traffic including airport, approach, and enroute air traffic control service."

41. "Advisory service" as defined in the Terminal Air Traffic Control Manual is "[a]dvice and information provided by a facility to assist pilots in the safe conduct of flight and aircraft movement."

42. "Traffic information" as defined in the Terminal Air Traffic Control Manual is "[i]nformation issued to alert an aircraft to any radar targets or visually observed or otherwise known traffic which may be in such proximity to its position or intended route of flight to warrant its attention."

43. Ground controller Pfaff did not provide air traffic control service as set forth in the Terminal Air Traffic Control Manual, Paragraph 250, in that he did not provide any air traffic control service based upon the observed and known Delta and Ozark aircraft taxiing prior to the accident.

44. Ground controller Pfaff did not comply with the mandatory provision in the Terminal Air Traffic Control Manual, Paragraph 825, in that he did not utilize the ASDE radar equipment in the tower when it was available for his use and he was specifically controlling the Delta and Ozark aircraft along taxiways in an area of non-visibility from the tower.

45. Ground controller Pfaff did not comply with the Terminal Air Traffic Control Manual, Paragraph 251, in that he did not issue any approval or disapproval on the movements of the Ozark and Delta aircraft regarding their conflicting routes sufficient to have avoided the conflict and collision between the aircraft.

46. The Facility Operation Manual is a handbook that provides controllers with administrative and operation procedures for the efficient operation of facilities and the provision of satisfactory service to the aviation public.

47. The Facility Operation Manual, Paragraphs 152.2 and 152.3, provides that the ground control and radar position assists other operating positions by handling taxiing aircraft and vehicular traffic on the landing area and employs aircraft surface detection radar equipment (ASDE) to provide ground control functions.

48. Paragraph 202.2 of the Facility Operation Manual provides that the tower controllers are responsible for formulating and issuing clearances and control instructions to

provide separation between aircraft operating under the jurisdiction of the facility.

49. As a direct result of the subject collision, Ozark and Delta were caused property damage in the amounts of $27,107.01 and $57,737.-86, respectively, for direct labor charges, costs of materials, and miscellaneous expenses (excluding claims for overhead and loss of use of aircraft).

*Conclusions of Law*

■ 1. The United States of America was negligent in failing to advise or inform either Delta Flight 102 or Ozark Flight 001 of the position and intended route of the other aircraft, and in failing to give proper taxi clearances and instructions to Delta Flight 102 and Ozark Flight 001 in order to avoid a collision. Further, the United States of America failed to comply with the mandatory provisions of its own manuals and regulations promulgated to prevent taxiing aircraft collisions, and negligently failed to utilize the airport surface detection equipment readily available and designed for the ground controllers' use in order to avoid collisions between taxiing aircraft not visually perceptible to ground controllers.

■ 2. Delta Air Lines, Inc. carelessly and negligently operated its aircraft, Delta Flight 102, and proximately caused the collision of Delta Flight 102 and Ozark Flight 001 in that the Delta crew carelessly and negligently failed to keep a proper lookout for other aircraft despite the fact that it was, or should have been, aware of the presence of said aircraft by virtue of monitoring the ground control frequency. Also, the Delta crew had the opportunity and duty to see and avoid the Ozark aircraft and, despite said duty and opportunity, proceeded into an intersection and collided with Ozark 001.

■ 3. Ozark Air Lines, Inc. operated its Ozark Flight 001 in a prudent and careful manner and was unable to reasonably see and avoid the Delta aircraft and prevent the collision.

4. Ozark Air Lines, Inc. shall recover damages in the amount of $27,107.-01 from Delta Air Lines, Inc. and the United States of America.

5. Delta Air Lines, Inc., by virtue of its own negligence, shall take nothing in damages.

The sole legal issue in this case revolves around the question of negligence. The following is a discussion of the duty of care exacted from each of the parties and whether or not any of the parties breached that duty.

*United States*

■ Federal aviation standards promulgated by statute or regulation shall be followed as the law in Illinois. *Ill. Rev.Stat.* ch. 15½, §§ 22.27, 22.29 (1967). These standards confer various duties upon air·traffic controllers. *See Somlo v. United States*, 274 F.Supp. 827, 836 (N.D.Ill.1967), *aff'd*, 416 F.2d 640 (7th Cir. 1969), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). Also, when the government undertakes to perform services not required by specific legislation, it has the duty to perform these services carefully. 274 F.Supp. at 837.

The air traffic controller in the instant situation was Mr. Wallace D. Pfaff. Mr. Pfaff first issued a clearance to Delta over ground control frequency 121.9. Delta received a clearance to go over the bridge taxiway and use the outer circular taxiway to the Delta terminal gate. Thereafter, on the same ground control frequency 121.9, Ozark received a taxi clearance to runway 9 left via the outer circular taxiway. Obviously, these two routes are somewhat conflicting.

Mr. Pfaff stated that he provides clearances, advice and information to pilots within his jurisdiction. He said that he generally does not issue a warn-

ing "simply because two aircraft are converging;" however, he would issue a warning if he felt there was a possibility of collision. Pfaff Statement (hereinafter referred to as Ex. P), page 2. Mr. Pfaff agrees that a controller's responsibilities include providing separation between aircraft operating under the jurisdiction of the facility as set forth in the Facility Operation Manual, 202.1(C). Ex. P, pages 3–4. Obviously, in the instant situation, Mr. Pfaff failed to provide separation between the Ozark and Delta aircraft.

When he issued the clearances to Delta and Ozark, Mr. Pfaff considered the fact that their intended routes would converge at some point; however, he felt that the time factor and the distances involved did not warrant his telling one crew about the other crew. Ex. P, page 4. This is especially curious since Ozark received its clearance after the Delta clearance was issued, and Ozark had a shorter distance to travel to reach the point of collision. Mr. Pfaff's judgment was proven wrong when the two aircraft did in fact collide.

Mr. Pfaff has further stated that he is not required to use the airport surface detection equipment (ASDE) to provide any specific navigational guidance for aircraft. He said it was not customary or routine to use the ASDE except where there was reduced visibility. Ex. P, page 5.

However, the Terminal Air Traffic Control Manual, 7110.8, issued by the Federal Aviation Administration, at Paragraph 825, specifically states that ASDE is to be used to observe aircraft movement on runways and taxiways not only during low visibility conditions but also to supplement information obtained by visual observations and pilot reports. Mr. Pfaff admitted he was aware of Paragraph 825 at the time of the accident. Ex. P, page 7. Thus, in the present situation where Mr. Pfaff was aware that the aircraft would be moving in an area not visible to the tower, and where he was aware that the two

aircraft were cleared to follow a route which would converge in an area which he could not observe, Ex. P, page 3, he was required to use the ASDE to supplement the information which he obtained visually. Also, Mr. Pfaff stated that if the ASDE set had been operating, he could have determined the positions of the Delta and Ozark aircraft, Ex. P, page 7, and, thus, assumedly, have prevented the accident by advising each of the aircraft of the relative position of the other.

Pursuant to Paragraph 250 of the Terminal Air Traffic Control Manual, a traffic controller must "[p]rovide airport traffic control service based only upon observed or known traffic and airport conditions which might, in your [controller's] judgment, constitute a hazard." Airport traffic control service is "[a]ir traffic control service provided by an airport traffic control tower for aircraft operating on the movement area and in the vicinity of an airport." Terminal Air Traffic Control Manual, Paragraph 20. Air traffic control service is "[a] service provided for the purpose of promoting the safe, orderly, and expeditious flow of air traffic including airport, approach, and enroute air traffic control service." Terminal Air Traffic Control Manual, Paragraph 20. This court is of the opinion that Mr. Pfaff obviously failed to provide adequate service in an effort to promote a safe, orderly and expeditious flow of known converging traffic.

The above discussion illustrates that Mr. Pfaff breached his duty of promoting safety for air traffic by failing to perform the duties conferred upon him by regulation. Even Mr. Edmund Burke, the government's air traffic control expert, testified that in his opinion Mr. Pfaff, with no difficulty, could have advised the Delta and Ozark crews as to the traffic conditions and their relationship to each other during the time preceding the accident. Tr. 487, 488.

There is no doubt that Mr. Pfaff's failure to perform his duties constituted

a proximate cause of the accident between the Ozark and Delta aircraft in that the breach of his duties "was a link in an unbroken chain of circumstances which proximately caused the accident." *See Deweese v. United States,* 13 Avi. 17,486, 17,497 (D.Colo.1974). Also, the parties have stipulated that actual damage resulted from the occurrence of the accident. Thus, this court is of the opinion that the government, through Mr. Pfaff, breached its duty of care thereby proximately causing an accident which resulted in actual damage and, therefore, the government was negligent.

*Delta Air Lines, Inc.*

The parties have stipulated that on May 8, 1969, Delta Air Lines, Inc. leased and operated a DC–8–61 aircraft which had landed on runway 14 left at Chicago-O'Hare Airport shortly after midnight and was proceeding on the bridge taxiway. As indicated previously, at approximately 1202:05 A.M. or 0502:05 GMT the Delta crew communicated with the ground controller on the ground control frequency 121.9 and received a taxi clearance to go over the bridge taxiway and use the outer circular taxiway to the Delta terminal gate. Thereafter, the Ozark crew, on the ground control frequency 121.9, received a taxi clearance to runway 9 left via the outer circular taxiway. The clearance given to Ozark was recorded by the cockpit voice recorder of the Delta aircraft. Since the Ozark crew was not yet in contact with the ground controller, the Ozark crew did not hear the Delta clearance.

The Delta crew, as well as the Ozark crew, have a duty to operate their aircraft in a careful manner, and there is testimony from both crews to this effect. *See* Statement of Fauser, at pages 8, 10; Statement of Mann, at page 7; Statement of Grant, at page 3. This court is of the opinion that the above facts indicate that the Delta crew either was, or should have been, aware of the conflict between the Delta route and the Ozark route. This subjective or objective knowledge should have put a reasonable person on notice that a collision was possible. The Delta crew should have communicated further with the ground controller in an effort to reconcile the conflicting routes, and its failure to do so constituted a breach of its duty to use due care in the operation of its aircraft.

■ The duty of due care imposed upon the Ozark and Delta crews necessarily implies the duty of aircraft crews to see and avoid each other. Needless to say, in the instant case, the relevant times regarding the ability to see and avoid each other were those times prior to the accident when the collision still could have been avoided. Prior to the collision, the Delta aircraft was coming from the right rear quadrant of the Ozark aircraft and was behind the right shoulder of the Ozark co-pilot as the intersection was approached. Even Delta's own expert testified that the Delta crew had the better opportunity to see the Ozark aircraft until the collision became imminent. Tr. 215. Thus, this court is of the opinion that the Delta crew breached its duty of care to Ozark and thereby proximately caused damage to the Ozark aircraft.

*Ozark Air Lines, Inc.*

Since it has been determined that both the United States, through ground controller Pfaff, and Delta were negligent, Ozark can recover for the damage to its aircraft if Ozark itself is free from contributory negligence.

■ Since Ozark was not on the ground control frequency when Delta received its clearance, there was no way for the Ozark crew to know about the converging course which Delta was on unless the Ozark crew actually saw the Delta aircraft. The Delta aircraft approached from the right rear quadrant of the Ozark aircraft, overtook the Ozark aircraft and taxied past the Ozark aircraft without stopping. As indicated previously, Delta had the better chance to see the Ozark aircraft until the collision became imminent. Thus, this court

has determined that the Ozark crew was not negligent in the operation of its aircraft.

*Damages*

This court is of the opinion that both the United States and Delta Air Lines, Inc. were actively negligent in the instant situation. Thus, this court holds that the United States of America and Delta Air Lines, Inc. are jointly and severally liable to Ozark Air Lines, Inc. for the amount of damage stipulated to by the parties, such amount being $27,107.-01.

It is therefore ordered that judgment be, and it hereby is, rendered for the plaintiff Ozark Air Lines, Inc. in the amount of $27,107.01.